## CUNNINGHAM v. MERCHANTS' NAT. BANK OF MANCHESTER, N. H. *

### In re PONZI.

(Circuit Court of Appeals, First Circuit. January 6, 1925.)

### No. 1703.

**1. Bankruptcy ⟨⟩303(3)—Evidence held to show bankrupt's deposit in bank general, and not special deposit to protect particular investors.**

Evidence *held* to show that money deposited in bank by bankrupt when insolvent was general deposit, and not special deposit, to protect particular investors.

**2. Banks and banking ⟨⟩119—Understanding depositor should keep deposit sufficient to satisfy claims of local investors held not to prevent deposit from being general.**

Understanding between bank and depositor that depositor should keep deposit in bank sufficient to satisfy claims of local investors *held* not to prevent deposit from being general deposit, subject to check.

**3. Bankruptcy ⟨⟩303(3)—That bank suspected depositor's business not legitimate held not to show it knew of his insolvency.**

That bank had suspicion, or that its officer realized, that bankrupt depositor's business was not legitimate, was insufficient to show that bank knew depositor was insolvent.

**4. Bankruptcy ⟨⟩185—Duty of bank to inquire into depositor's financial condition before closing his account and holding deposits for future bankruptcy trustee.**

It would be duty of bank to inquire very carefully into financial condition of depositor before closing his account and holding deposits for future bankruptcy trustee, even if bank had right to take such action.

**5. Banks and banking ⟨⟩140(1)—Bank cannot question legitimacy of depositor's disbursements.**

Under ordinary circumstances it is duty of bank receiving money on deposit to pay it out on depositor's order, and it cannot question legitimacy of his disbursements.

**6. Banks and banking ⟨⟩140(5)—Bank may decline to pay check exceeding amount deposited.**

Where there are not sufficient funds to pay check, bank may legally decline to pay what it has on deposit as partial payment of check.

**7. Banks and banking ⟨⟩119—Banks under no legal duty to warn investing public as to financial condition of depositors.**

Banks are under no legal duty to warn investing public as to financial condition of their depositors.

**8. Bankruptcy ⟨⟩178(1) — Persons securing unlawful preference and bank aiding therein held not guilty of hindering, delaying, or defrauding creditors.**

That persons in whose favor bank paid bankrupt's checks and vouchers obtained un-

*Certiorari denied 45 S. Ct. 511, 69 L. Ed. —.

lawful preference would not necessarily show that such persons and bank hindered, delayed, or defrauded creditors, within Bankruptcy Act, § 67e (Comp. St. § 9651), or render bank liable, since bank received no money or benefit from bankrupt.

**9. Bankruptcy ⟨⟩175—Bankrupt's creditors not guilty of securing fraudulent preference, without distinct intent so to do.**

Bankrupt's creditors are not guilty of securing fraudulent preference, without distinct intent so to do.

**10. Bankruptcy ⟨⟩178(1)—Bankrupt's deposit in bank not fraud on creditors; "fraudulent transfer."**

Bankrupt's deposit in bank of money to his own credit is not "fraudulent transfer" of property as against creditors, in violation of Bankruptcy Act, § 67e (Comp. St. § 9651).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraudulent Transfer.]

**11. Bankruptcy ⟨⟩185—In absence of fraud or collusion by bank in paying bankrupt's checks and vouchers while he was insolvent, bank not liable.**

Where there was no fraud or collusion by bank in paying bankrupt's checks and vouchers while he was insolvent, to investors from whom money had been obtained by bankrupt's fraud, bank was not liable to trustee in bankruptcy, under Bankruptcy Act, § 67e (Comp. St. § 9651).

**12. Bankruptcy ⟨⟩185—Bank not liable, as participating in fraudulent transfer of bankrupt's deposit to defrauded investors, without actual fraud.**

Bank, in absence of actual fraud, would not be liable for paying bankrupt depositor's checks and vouchers to defrauded investors, even though bankrupt thereby made transfer, in violation of Bankruptcy Act, § 67e (Comp. St. § 9651).

**13. Appeal and error ⟨⟩1009(1)—Findings in equity case should not be disturbed, unless clearly wrong.**

Trial court's findings in equity case should not be disturbed, unless clearly wrong.

**14. Banks and banking ⟨⟩140(1)—Check protested because in excess of deposit held not revocation of depositor's order to pay vouchers.**

Drawing of check, which was protested because for sum greater than deposit, did not in itself revoke bank's authority to pay smaller checks afterwards presented, or depositor's order to bank to pay certain vouchers, so long as there were funds in depositor's account sufficient to pay them.

**15. Bankruptcy ⟨⟩185—Bankruptcy Act does not authorize recognition of fraud not denounced therein, nor impose penalties on persons who received no benefits.**

Bankruptcy Act (Comp. St. §§ 9585–9656) does not authorize recognition of any fraud not distinctly denounced therein, nor does it im-

pose penalties on persons who have received no benefits from bankrupt's transfers of property.

Anderson, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of New Hampshire; George F. Morris, Judge.

Suit by Henry V. Cunningham, trustee, against the Merchants' National Bank of Manchester, N. H. Decree for defendant (Lowell v. Merchants' Nat. Bank of Manchester, N. H., 283 F. 124), and plaintiff appeals. Affirmed.

William R. Sears, of Boston, Mass. (Hugh D. McLellan, Clarence M. Gordon, and Samuel P. Sears, all of Boston, Mass., on the brief), for appellant.

Edward E. Blodgett, of Boston, Mass., and George T. Hughes, of Dover, N. H. (George S. Fuller, of Boston, Mass., on the brief), for appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. This is a suit in equity by the trustee in bankruptcy of Charles Ponzi for an accounting, and to recover from the Merchants' National Bank of Manchester, N. H., $197,905.25, on the ground that it participated in a voidable preference, or in a transfer in fraud of creditors, to the extent of said sum, and in the alternative to recover from said bank the sum of approximately $73,000 alleged to have been paid from the bankrupt's account in said bank without authority from the bankrupt. The case grows out of what has been characterized by the Supreme Court as "the remarkable criminal financial career of Charles Ponzi." It comes before us upon plaintiff's appeal from the decree of the United States District Court for the District of New Hampshire, dismissing the bill in equity. There are 27 assignments of error. The plaintiff's contentions are, however, substantially stated by the District Court to be:

(1) That the defendant is liable as having participated in a voidable preference to the extent of $197,905.25.

(2) That the defendant is liable as having participated in a transfer in fraud of creditors to the extent of $197,905.25.

(3) That the defendant is liable as having paid from the account standing in the name of Securities Exchange Company, the title under which Charles Ponzi did business, the sum of approximately $73,000 aft-

er the authority to make such payments, originally given by Ponzi, had been withdrawn.

At the hearing before us the plaintiff did not rely upon his claim that the defendant had participated in a voidable preference, but urged his second proposition, that the defendant participated in a transfer in fraud of creditors, under section 67e of the Bankruptcy Act (Comp. St. § 9651). That section provides:

"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt * * * with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned, or incumbered as aforesaid shall * * * be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors. * * * *"

In December, 1919, Ponzi went into business in Boston under the name of the Securities Exchange Company, with a capital of about $150. He sold his personal notes, by the terms of which he promised to pay, in 90 days, 50 per cent. more than the amount of each note. He advertised that he was able to pay this high rate of interest from the fact that he was engaged in buying international postal coupons in foreign countries, and selling them in other countries at 100 per cent. profit, and that he could do this by reason of the excessive difference in the rates of exchange following the war. During his entire career, from December 20, 1919, to July 26, 1920, the total amount of the notes issued by him on the basis of investment value was $9,582,-591.82. It appears that he was never actually engaged in any business, other than the sale of his own notes. He used money from later investors to pay the obligations of earlier investors. He had agents in different cities, to whom he paid commissions ranging from 10 to 15 per cent. on all moneys collected for him. He was always insolvent; as time went on he became more and more so, as his business succeeded, and up to the time when he was adjudged a bankrupt, October 25, 1920.

[1] The following finding of the District Court, with reference to Ponzi's first deposit with the defendant bank, so far as we know, is unchallenged:

"One Joseph Bruno was Ponzi's agent in the city of Manchester, N. H., and on April 26, 1920, he opened an account in the defendant bank in the name of 'Securities Exchange Company.' Shortly after the account was opened the bank, through its cashier, learned that the Securities Exchange Company was not a corporation, but a name under which Charles Ponzi, as an individual, was doing business. Ponzi's first appearance at the bank of the defendant was on June 24, 1920. At that time he had a conversation with Mr. Additon, defendant's cashier, in which he said that he was able to pay 50 per cent. profit in 45 days owing to his extensive connections in Europe, and that he was dealing in international reply coupons and foreign exchange. This information was conveyed by Mr. Additon to the president of the bank and to the directors. While at the bank, Ponzi asked for a blank check, and filled it out on the Hanover Trust Company, Boston, for $100,000 payable to the Merchants' National Bank. I do not find that this deposit was made as a result of any request of the bank. It was made by Ponzi for the purpose of impressing the bank with his great wealth, as on the same day he filled out another check for the sum of $250 as a present to the help in the bank, writing across it, 'For the help of the bank with the compliments of Charles Ponzi.' I am of the opinion and find that this display of wealth in the presence of the bank officials was a part of Ponzi's advertising scheme. As a further inducement to the people of Manchester and vicinity to invest their money with him, Ponzi either personally or through his agent informed the bank that he wished to keep enough money on deposit, so that any persons dissatisfied with their investments could come to the defendant bank at any time and receive their money back. I find as a fact that there was an understanding between Ponzi, the defendant bank, and Joseph Bruno, that Ponzi should maintain a large deposit in the defendant bank, and enough to satisfy the claims of Manchester investors whose notes matured and any who were dissatisfied with their investment and wanted their money returned. It is not probable, however, that the question of returning money to dissatisfied investors received serious consideration until about July 26, 1920."

Judge Morris further finds that the deposit was a general deposit, subject to checks drawn by Charles Ponzi, Lucy Meli, or Louis Cassello, in favor of any individual or institution in Manchester or elsewhere. This finding of the District Court is sharply challenged by the plaintiff. The contention of the plaintiff is that the bank did not act as a mere depositary, but that it used the deposit merely as a means of protecting Manchester noteholders; that, with knowledge of Ponzi's insolvency, it participated in a transfer in fraud of creditors, by allowing payments to be made from Ponzi's accounts to creditors, who thus received a voidable preference; and that, therefore, the bank should be held liable to the plaintiff to the extent of such payments, which amounted to $197,905.25.

In dealing with these questions it is necessary to look sharply at the facts shown by the record, and at the findings of the District Court.

The District Court had before it witnesses on the question of the character of the deposit. The president testified that nothing was ever reported to him that this account was a special deposit; there was never any instructions given by the board of directors that any portion of the account was to be a special deposit; there was no agreement by the bank to hold any portion of the fund for the Manchester investors or for any special purpose. The cashier testified that the deposit was taken as a general deposit, subject to check, the same as any other deposit; that the deposits were received from Ponzi and Bruno, his agent, and were subject to check and withdrawal at a moment's notice, and that there could not be any binding agreement that they should be used for any special purpose; that the bank never refused payment of any checks and orders, if there were sufficient funds in the bank; that he understood that he was obliged to recognize checks of Ponzi, Cassello, or Miss Meli, as well as vouchers approved by Bruno, pursuant to the order of July 26th, to which reference will be made hereafter; that in the receipt of moneys he was not guided by any agreement made by anybody. Wyman testified that, as attorney for Ponzi or Bruno, he made no agreement with the bank, or any official of the bank, that there would be no withdrawals of the fund except for the benefit of New Hampshire investors, and that there never was an agreement made that funds deposited in the name of the Securities Exchange Company

should be held only for the benefit of the New Hampshire creditors.

[2] Upon this point the District Court was influenced by the evidence that checks were honored, drawn in favor of persons or institutions other than Manchester investors, and that this was notably the case in reference to $200,000 drawn July 28, 1920, $100,000 drawn August 4, 1920, and $50,000 drawn August 5, 1920; this being a critical period in Ponzi's career, when, if there was a binding agreement to protect any class of depositors, the bank might well have refused payment on these three checks. From an examination of the account of the Securities Exchange Company, showing the deposits and withdrawals, and from other proofs in the case, it is clear that the account was an ordinary general account, subject to check, and that the District Court was right in so finding. The understanding that Ponzi should keep a large enough deposit in the bank to satisfy the claims of Manchester investors does not prevent the account from being a general account, subject to check. Such understanding relates only to the size of the account; it is merely a provision that the account should be kept large enough to pay the Manchester investors when checks should be drawn in their favor.

The plaintiff has offered no testimony from Ponzi or Bruno to contradict the testimony of the officers of the bank.

The proofs show that on July 2, 1920, Mr. Additon, the cashier, Mr. Bruno, and Mr. Wyman, his counsel, went to Boston and secured from Ponzi three $50,000 checks ($150,000) for deposit in the defendant bank. This was obtained in pursuance of the desire of the bank that Ponzi should keep a deposit in Manchester substantially large enough to protect Manchester investors. The District Court finds, however, that there is no testimony that the bank considered money deposited by Ponzi charged with any trust in favor of the Manchester depositors, but that the deposit was a general deposit account.

The record shows that on July 26th it was found that Ponzi's business affairs were being investigated in Boston and that he had agreed to stop taking money from new investors until the investigation was closed. It was reported that a "run" was being made on the Boston office by his investors; thereupon Wyman telephoned Miss Meli in Boston and inquired about the matter, and was informed by her that all claims of investors who were dissatisfied with their investments would be paid on presentation at the Boston office. Wyman said this would hardly be satisfactory to the Manchester investors; that they would not like to have to go to Boston to get their money. Accordingly that evening Wyman, Bruno, and Additon went to Boston and met Ponzi at his home in Lexington. Touching this interview the District Court makes a finding:

"While there they were assured by him that everything was all right; that everybody could have their money back if they were dissatisfied; and this statement was backed up by a very large display of wealth on the part of Ponzi, consisting of certificates of deposit, in various banks, aggregating over $1,500,000; $200,000 or $300,000 in bills of large denomination, about $200,000 of stock in the Hanover Trust Company and other trust companies, and a large quantity of Liberty bonds. While at his home they discussed the general condition of his affairs with Ponzi and his local attorney, and particularly the Manchester situation. They were assured that his finances were all right and that he was solvent. I find that Mr. Additon, who was acting for the bank, was convinced by his display of wealth that Ponzi's statement that he was able to pay everybody who wanted his money back was true. Before leaving they obtained an order from him of which the following is a copy:

"'July 26, 1920.

"'To the Merchants' Nat. Bank, Manchester, New Hampshire.

"'Please pay and charge to the account of the Securities Exchange Company in the Merchants' National Bank of Manchester, New Hampshire, any and all vouchers issued by the Securities Exchange Company of Boston for the amount designated on the back of such vouchers and only for those bearing the approval of Joseph Bruno, Agent.     Securities Exchange Co.

"'By Charles Ponzi, Mgr.'

"It was also arranged that an advertisement should be published in the Manchester papers, which arrangement was carried out. The advertisement was worded as follows:

"'Conforming to a personal agreement made between Charles Ponzi, of the Securities Exchange Company, and District Attorney Pelletier of Boston, this branch of the Securities Exchange Company, 51 Hanover street, will not receive funds for investment until after an official audit is made to determine the solvency of this company and to satisfy the district attorney that our methods of financial operation are thoroughly legitimate.

" 'Meantime—we will pay all maturing obligations as fast as presented.

" 'Further—during the audit of the books any persons holding unmatured notes can receive back their original investment, without interest, if they desire.

" 'Joseph Bruno, Agent,
" 'Room 1, 51 Hanover Street,
" 'Manchester, N. H.' "

[3] It is urged by the plaintiff that the facts discovered July 26 should cause the bank to be chargeable with knowledge that Ponzi was then insolvent. The District Court has found, however, that the bank was not so chargeable with knowledge until August 2d, when an article was published in the Boston Post declaring Ponzi insolvent, and stating that he had sent no money to Europe and received no money from Europe. Judge Morris makes the further finding:

"The fact that Mr. Additon had made frequent inquiries about Ponzi's business, and whether it was possible for him to make such enormous profits by dealing in international reply coupons and foreign exchange, and the fact that at all times he carried such a large deposit in the defendant bank without withdrawing and investing same, must have created a suspicion in the minds of the bank officials that Ponzi's business was not entirely legitimate. But I cannot find that they really knew or had reasonable cause to know that his business was not legitimate and that he was insolvent prior to August 2d."

[4] It is urged by the plaintiff that all the facts known by the bank on July 26th should have caused something more than a suspicion that Ponzi's business was not legitimate. Viewed in the light of subsequent events relating to Ponzi's swindle, it is readily suggested that Additon should not have been satisfied with knowing that Ponzi had large assets, but that he should have required an authoritative statement as to his liabilities. But we must view the transaction in the light of what had actually happened at the time of Additon's interview in Boston. The Boston banks dealing largely with Ponzi had made no disclosures, and apparently no discoveries, that Ponzi was a swindler and was insolvent. Neither the Boston banks nor this bank of New Hampshire had any direct evidence of his criminality, and it is not strange that Additon was deceived by a great display of wealth. The bank had received Ponzi's deposits like the deposits of any other man; he had, so far, kept his agreements with the bank. If the bank had suspicion, even if Additon realized that Ponzi's business was "not a legitimate undertaking," this is far from showing that the bank knew at that time that Ponzi was insolvent. On the other hand, Additon testified affirmatively that he did not know of such insolvency until "some little time after we had stopped paying on the account," and that, up to that time, he did not believe him to be insolvent. It would be the duty of the bank to inquire very carefully into the financial condition of a depositor before closing his account and holding the deposits for a future trustee in bankruptcy, even if it should be held that the bank had any right to take such action.

The affirmative evidence of the bank's officials is that, at the time all the deposits were made, the bank officers had no knowledge or belief that Ponzi was bankrupt. In Cunningham v. Commissioner of Banks, June 5, 1924, 144 N. E. 447, the Massachusetts court found that the Hanover Trust Company should have known Ponzi was insolvent at the latest on July 12, 1920. We cannot tell what record the Massachusetts court had before it to fix this date. We are governed by the record before us. It was from this record that Judge Morris found that the bank did not know that he was insolvent, or have reasonable cause to know it, prior to August 2d. This was the date shown in the record of the Supreme Court in Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873.

[5, 6] We cannot find from the record in the case at bar that the District Court was wrong in this finding. Facts which warrant suspicion would not necessarily cause the bank to know, or have reasonable cause to know, that Ponzi was bankrupt, or that he was a swindler. There is a moral duty of banks to the community in which they do business to use reasonable care in seeing that their depositors are not committing a fraud upon the public. But if we look at the strict duty of the bank, as a matter of law, it may be of little consequence to fix the exact date when the bank knew that Ponzi was insolvent, for it is the clear duty of a bank to honor all orders of a depositor, even though the bank may know that the depositor is insolvent. Under ordinary circumstances, a bank cannot question the legitimacy of a depositor's checks on his bank account. It is bound to pay the depositor's orders, so long as there are sufficient funds in the bank to meet them. Armstrong v. American Exchange Bank,

133 U. S. 433, 10 S. Ct. 450, 33 L. Ed. 747; National Bank v. Insurance Co., 104 U. S. 54, 64, 26 L. Ed. 693; Third National Bank v. Ober, 178 F. 678, 102 C. C. A. 178. But, when there are not sufficient funds in the bank to pay checks, the bank has a legal right to decline to pay what it has on deposit as a partial payment on same. Dana v. Third National Bank, 13 Allen, 445, 90 Am. Dec. 216; Beauregard v. Knowlton, 156 Mass. 395, 31 N. E. 389.

[7] Banks are under no duty at law to warn the investing public as to the financial condition of their depositors. Investors may be assumed to keep themselves reasonably informed as to the financial capacity of persons with whom they are dealing in their investments. Banks are not immune from human selfishness, and it is quite probable that this bank was anxious to get as large a deposit as possible. But we cannot find, from the record, that it used undue means to obtain a large deposit, or that its officers have been guilty of perjury when they say that they did not know of Ponzi's insolvency and did not believe him to be a bankrupt. It is easy to attack banks after a depositor has proved to be a swindler; but, as we have said, this bank must be judged from the evidence it had before it at the time of the transaction. We clearly should not be prejudiced by the suggestion that Ponzi would not have been able to deceive the public if he had not had the assistance of banks. It is true that many of the commercial frauds perpetrated upon the public could not be accomplished without the aid of banks; but banks have become a part of the commercial world, and cannot be abolished merely because they are unable to insure themselves or the public against possible operations of swindlers.

[8] In passing upon the question whether the bank participated with note holders and with Ponzi in an intent to hinder, delay, and defraud creditors, we have before us a question largely of fact. Judge Morris in the District Court did not find that the voucher holders, who received, through Bruno, the amount of their original investments were preferred creditors. Since the hearing in the District Court, the Supreme Court has held that investors who, on August 2d and afterwards, hurried to get their money, were seeking a preferential payment; that "those who were successful in the race of diligence * * * secured an unlawful preference"; that such investors, in obtaining their money, were not seeking to rescind a contract for fraud, but were relying upon Ponzi's contract to pay them the amount of their investments, if they should choose to call for it. Cunningham v. Brown, 265 U. S. 1, 11, 13, 44 S. Ct. 424, 427, supra. The Supreme Court held that such investors were obtaining a preference; but it did not say that they were guilty of obtaining a transfer with intent to hinder, delay, or defraud Ponzi's creditors. If it shall be found that the note holders in the case before us were obtaining a preference, it does not follow that they were guilty of anything denounced by section 67e of the Bankruptcy Act.

In Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 582, 33 S. Ct. 343, 345 (57 L. Ed. 652) in speaking for the Supreme Court, Mr. Justice Lamar says:

"The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is malum per se and the other malum prohibitum, and then only to the extent that it is forbidden."

He points out that much further testimony is required to prove the more serious offense than the lighter offense. A bankrupt may be guilty of both offenses, but there is no necessary connection between the two. In Richardson v. Germania Bank, 263 F. 320, 324, in speaking for the Court of Appeals for the Second Circuit, Judge Hough cites Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419, in which the Supreme Court announces that: "Securing 'an advance with which the insolvent debtor intends to pay a pre-existing debt does not necessarily imply an intent to hinder,' defraud," etc.; and Judge Hough quotes the language of Judge Lamar, in the Germania Bank Case.

[9] In the case at bar, if the bank should be held to have made a preferential payment possible, it is not liable here, for it is not a creditor and has received no benefit. While it is possible for a preferred creditor to be also party to a fraudulent transfer under section 67e, there is nothing in this record to show any act of the note holders to do anything more than to secure a preference. The record discloses no fraudulent act of theirs within the meaning of section 67e of the Bankruptcy Act; and the District Court had found that they have not been guilty of fraud. They could not secure a fraudulent preference without a dis-

tinct intent so to do. Coder v. Arts, 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 33 S. Ct. 343, 57 L. Ed. 652, supra.

The plaintiff relies upon Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419, supra. In that case an insolvent borrowed money of a relative and secured the loan by a mortgage of all his property. The money was obtained and used to satisfy one of the bankrupt's pre-existing debts. The mortgagee and insolvent both knew of the insolvency, and it was held that these facts warranted the court in concluding that the insolvent intended to defraud his creditors within the meaning of section 67e of the Bankruptcy Act. In that case the person held liable had received security from the bankrupt for a payment of money made to prefer certain creditors. In the Beerman Case (D. C.) 112 Fed. 663, and in other cases of this character, brought to our attention, the parties from whom the relief was sought, and against whom the action was brought, had the property. In the case at bar the bank had received no security and no benefit from the bankrupt. There is nothing which the plaintiff can "recover and reclaim" from the bank by legal proceeding, for the benefit of creditors, because the bank has nothing in its possession received from the bankrupt.

[10] It is admitted that the bank cannot be held as a participant in a preference under section 60a (Comp. St. § 9644) and that it cannot be held under 60b. It is difficult to see how it can be held under 67e, when the evidence does not show that the note holders themselves had been parties to any transfer in fraud of creditors. If the bank had received any transfer it must have been a deposit; but "a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift or security." New York County Bank v. Massey, 192 U. S. 138, 147, 24 S. Ct. 199, 201 (48 L. Ed. 380).

[11] We have already called attention to the order of July 26th from Ponzi to the bank to pay and charge to the account of the Securities Exchange Company any and all vouchers issued by the Securities Exchange Company for the amount designated on the back of the vouchers, and only for those bearing the approval of Joseph Bruno, agent. The order put the so-called vouchers in place of checks. By this order the bank was under the duty to pay all the vouchers from any locality, just as it paid checks. It appears, and the District Court finds, that: "After July 27, all investors who expressed a desire to receive their money back, without interest, presented their note or notes to Mr. Bruno and had them stamped on the back and approved by him for the face value of the note. Notes so stamped and approved were presented to the defendant bank and paid without checks being drawn therefor by the Boston office."

The District Court makes a tabulation of payments made on the order of Bruno, marked "vouchers," and checks drawn by Ponzi's Boston office, marked "checks"; the account tabulated ran from July 27th to August 9th, and showed at the latter date the amount remaining in the bank to be $148.60. And the District Court finds further: "That between July 27 and August 9, inclusive, the defendant bank paid out $197,905.25 on vouchers or orders signed by Mr. Bruno. During the same period of time I find that the defendant bank paid on checks drawn in Ponzi's Boston office the sum of $469,091.86. Of this last amount $150,000 was drawn to the order of the Securities Exchange Company and deposited in the Hanover Trust Company in Boston. I find that on August 2d, and thereafter, the defendant bank paid Ponzi investors, on orders of Bruno, the sum of $170,333.25."

These further facts, in detail, are found:

"During the period between July 27 and August 9, when the defendant bank was paying out money on the Bruno orders, the bank sent to Ponzi's office in Boston a statement of the amount of vouchers paid at the close of each day's business, except August 2 and 3; the statements for those dates being included in a letter of August 4.

"At the opening of business on August 6, 1920, a check for $150,000, payable to the order of the Securities Exchange Company, and deposited in the Hanover Trust Company, was presented to the defendant bank for payment through the Federal Reserve Bank. This check was signed by Miss Meli, secretary. Later in the day another check was presented to the defendant bank by special messenger from the Hanover Trust Company for the sum of $200,000. At the close of business August 5 there was on deposit to the account of Securities Exchange

Company in the defendant bank $74,596.37. Both of the above-mentioned checks were protested for lack of funds. On August 6, 1920, another check for $75,000, signed by Charles Ponzi, payable to the Hanover Trust Company, was drawn and presented to the defendant bank on August 7. This was also protested. On August 7, the account of the Securities Exchange Company in the defendant bank had been reduced to $23,883.60. . The run on Ponzi's place of business in Boston was continuing, and it is evident that Ponzi was making an effort to call in money from outside banks for deposit in the Hanover Trust Company to meet the demands of Boston investors, and there is no doubt but that, if the money on deposit in the Manchester Bank had been sent to Boston it would have been paid out to other investors of Ponzi of precisely the same class as the Manchester investors, as was done with approximately all of the $150,000 withdrawn July 29 and August 2. Up to the time the bankruptcy petition was filed against him, August 9, 1920, Ponzi appears to have treated all of his creditors alike, in Boston, Manchester, and elsewhere. So far as appears, he paid all maturing obligations and extended notice by published interviews and advertisements, both in Boston and Manchester, that he would return the amount of their investment to all dissatisfied investors. In this respect Manchester investors were treated no differently from others, except as to the method and place of obtaining their money. Whether Manchester investors who secured the return of their money did so because of the advertisement, or because of the fact that they had been defrauded, does not appear, as no one who invested through Bruno's agency was called to testify. The fact that Ponzi gave the order of July 26, authorizing the bank to pay investors on Bruno's order made it more convenient for dissatisfied investors around Manchester to secure the return of their money than if they had been obliged to go to Boston for it; but it was no more convenient for them than it was for investors in and about Boston to go to Ponzi's Boston office. The defendant bank had no means of knowing whether the vouchers presented for payment were in favor of individuals investing through Bruno's agency or some other agency, except what it might assume from the fact that the notes presented bore Bruno's stamp. As to the $469,091.86 paid on checks drawn in the Boston office between July 27 and August 9, it had no means of knowing whether the payees resided in Manchester or elsewhere, unless the individuals were known to the officials of the bank. In at least one case Bruno indorsed the payments of notes amounting to $15,000 for an individual who invested through the Boston office. Whether there were other similar cases is not disclosed by the evidence. I find that the defendant bank paid all checks and vouchers presented when there were sufficient funds to the credit of the Securities Exchange Company, without distinction and without inquiry as to the residence of the payee, and that it is not guilty of any fraud or collusion with reference to such payments."

[12] We have thought best to quote fully from Judge Morris' findings of facts, in order to show the conditions under which the bank was acting. Upon an examination of the record we are of the opinion that the District Court was right in holding that there was no fraud or collusion on the part of the bank with reference to the payments of the checks and vouchers. We are of the opinion that no action can be sustained against the bank under section 67e to set aside any transfer of property with the intent to hinder, delay, and defraud creditors. The proofs fail to show that the voucher holders were parties to any fraudulent transfer, and it follows that the deposits made by Ponzi in the bank, which were used in payment of voucher holders, cannot be held to be a fraudulent transfer. But, even if the record had disclosed a transfer by the bankrupt, through the bank, to the voucher holders, such as is denounced by section 67e, we are of the opinion that the bank could not be held as a participant in such transfer, under the reasoning of the cases which we have cited. Active and actual fraud must be shown on the part of the bank with the creditors, to furnish the foundation for the maintenance of such a claim. Rubenstein v. Lottow, 220 Mass. 156, 164, 107 N. E. 818.

[13] We are satisfied with Judge Morris' findings on the question of fraud. The District Court is entitled to the benefit of the rule that findings made by a judge in an equity case, before whom the witnesses appeared personally and testified, should not be disturbed, unless they are clearly wrong. This rule is based upon the superior opportunity of the trial court to determine the question of the credibility of witnesses. Fuller v. Reed, 249 F. 158, 161 C. C. A. 210; Bank of Athens v. Shackelford, 239 U. S. 81, 36 S. Ct. 17, 60 L. Ed. 158; Tru-

jillo & Mercado v. Rodriguez, 233 F. 208, 147 C. C. A. 214.

[14] As to the third item of the plaintiff's claim, the District Court in its statement of facts has found:

"It is claimed by the plaintiffs that the three overdraft checks presented for payment, one for $150,000 August 6, one for $200,000 August 6 (sent by messenger), and one for $75,000 August 7, all of which were protested, operated as a revocation of the order of July 26, and that the subsequent payment of $74,596.37 by the bank was unauthorized. I find that the three checks were drawn, payable to the Tremont Trust Company, Boston, in a hasty effort to meet the urgent demands created by the 'run' on Ponzi's place of business in Boston. I find in them no indication that it was Ponzi's purpose to revoke the order of July 26, and I find that it was not revoked.

"The $74,596.37 on deposit when the first check was protested was disposed of as follows:

| | |
|---|---|
| Checks drawn on Boston paid by bank. | $ 5,354.52 |
| Vouchers signed by Bruno paid by bank. | 69,093.25 |
| Remaining in bank. | 148.60 |
| | $74,596.37 |

"At no time during the four months prior to August 9, 1920, the date when the bankruptcy petition was filed, was the defendant bank a creditor of Ponzi."

The plaintiff's assignment of error 21 is directed to this claim. It appears that after the presentation of the first check, $150,000, on August 6th, only $69,098.25 was paid to voucher holders. The balance—except $148.60, which has been tendered—was paid pursuant to checks drawn by Ponzi's Boston office. This is clearly shown by the testimony. It is clear that, by presenting the large checks on August 6th, Ponzi showed that he did not intend to live up to his agreement that he would keep a sufficient balance to take care of the Manchester investors, and it is claimed that the presentation of these large checks was, in law and in fact, a revocation of the voucher order of July 26th. These large checks were signed by Miss Meli under her authority to sign checks which we have already noted. She had clearly been given no power to revoke any orders which had been given by Ponzi. There is no evidence that Ponzi himself had any knowledge as to the drawing of these checks, and, in any event, the proofs do not show that he intended that their presentation should operate to revoke the order of July 26th. Neither Ponzi nor Miss Meli are called to show, as a matter of fact, that there was any intent of Ponzi to revoke such order. We cannot find that the drawing of the check was in itself any such revocation. It appears from the evidence that, after the protest of the large checks of August 6, certain vouchers and other small checks were paid; but we know of no law that the receipt of these large checks was a revocation of the right of the bank to pay any checks presented thereafter, so long as there were funds in the account sufficient to pay such checks. Castaline v. National City Bank of Chelsea, 244 Mass. 416, 138 N. E. 398, 26 A. L. R. 1484; Dana v. Third National Bank, 13 Allen, 445, 90 Am. Dec. 216; Beauregard v. Knowlton, 156 Mass. 395, 31 N. E. 389.

[15] The learned and able counsel for the plaintiff has intimated that, even though it should be found that no action against the bank can be based upon any special section of the Bankrupt Law, still, under the general provisions of the Bankrupt Law, an action for fraud may be sustained. We cannot find in the Bankrupt Law any authority to recognize any fraud that is not distinctly denounced by a section of the statute. Clearly, section 67e of Bankrupt Law seeks to protect creditors and give them the right to "recover money paid out in fraud of creditors." But the Bankrupt Law does not go to the extent of imposing penalties upon persons who have received no benefits by reason of anything the bankrupt has done.

Upon examination of the assignments of error, we think we have passed substantially upon all questions brought before us. Upon an examination of the whole record, our conclusions are that, by receiving money of the bankrupt on a general deposit account, and paying it out on checks and orders in the due course of business, the defendant bank cannot be held to have participated in any transfer with intent to hinder, delay, or defraud creditors, within the meaning of section 67e of the Bankrupt Act. We think that no case under the Bankrupt Act has been brought before us requiring relief on the part of the court, and that the proofs fully sustain the District Court in its conclusion.

The decree of the District Court is affirmed, with costs to the appellee in this court.

4 F.(2d)—3

ANDERSON, Circuit Judge (dissenting). With much regret, I find myself utterly unable to agree with the majority of the court. The case is one of great importance, both to the defendant and as a precedent. I do agree with them that the question "before us is a question largely of fact." Of course, if Ponzi's account was, as the majority hold, merely "an ordinary general account, subject to check," *without more*, the defendant is not liable. I cannot think that conclusion is warranted by the evidence, or even by the findings of the court below.

Under these circumstances, it seems better that I should throw my dissent into the form of a general statement of the whole case, as I see it, instead of adopting the more common and briefer method of referring, seriatim, to conclusions in the majority opinion from which I dissent.

The decision for the defendant (Lowell v. Merchants' Nat. Bank, 283 F. 124), now challenged, was rendered on August 11, 1922. Since that time the Supreme Court, on April 28, 1924, in Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873, has overruled the views entertained in this circuit both by the District Court (Lowell v. Brown, 280 F. 193) and by this court (284 F. 936), adverse to the right of Ponzi's trustees to recover as unlawful preferences repayments to his victims. Of course, the decision of the Supreme Court and all its implications must now by this court be fully applied. While recognizing and following the general rule as to the weight to be given to the findings of the trial court (Fuller v. Reed, 249 F. 158, 161 C. C. A. 210), the decision of the Supreme Court has substantially changed the perspective as to the controlling facts, and radically changed the questions of law of controlling importance. Moreover, inferences from facts found, as distinguished from the facts, are as open to this court as to the court below. The Supreme Court decision has made this a very different case from that with which Judge Morris dealt.

The general story of Ponzi's swindlings set forth in this record is substantially the same as has already several times appeared. See Cunningham v. Brown, supra; Lowell v. Brown, supra.

Late in 1919 Ponzi, having little or no capital, began to issue his notes payable with 50 per cent. interest in 90 days, and then paid them in 45 days. He claimed to be making 100 per cent. profit by dealing in international postal coupons, or foreign exchange, or both, in Europe. The earlier recipients of this 50 per cent. profit of course

became enthusiastic advertisers of his scheme, so that by the spring of 1920 he was selling the notes in large quantities, paying to various agents not less than 10 per cent. commission. It follows that, out of each $100 paid to his agents, Ponzi would get no more than $90; and, as at the end of 45 days he paid the note holder $150, he lost $60 on each $90 received (66⅔ per cent.), without reckoning clerical and other overhead expenses, besides his personal squanderings and wastings. But so abundant was the supply of gullible victims that, before he was finally stopped in late July, 1920, he had taken in about $9,500,000 of actual money. As Ponzi never showed anybody any evidence that he was carrying on any substantial business in international coupons, and as it would have been clear on superficial inquiry that no considerable business of the kind he described *could* be carried on, the scheme was from the outset plainly nothing but the old fraud of paying the earlier comers out of the later comers' money, pending the swindler's final probable absconding with the funds not then squandered by him or paid out to the earlier comers.

I turn to the facts of special significance in this case.

Ponzi employed as agent in Manchester, N. H., Joseph Bruno, a fruit dealer, who was a depositor in the defendant bank. Bruno opened an account with the bank in the name of Ponzi's alias, Securities Exchange Company, on April 26, 1920. Shortly thereafter the defendant's cashier and vice president, a banker of some 30 years' experience, learned that the Securities Exchange Company was not a corporation, but Ponzi under another name. By early June this account had grown to $15,000 or $20,000, large enough to attract the attention of the bank's officials. Inevitably, as Ponzi's sales of his notes increased in Manchester, the bank became the recipient of inquiries from investors and prospective investors concerning the nature of Ponzi's business. As to such inquiries the cashier said: "It put me in a peculiar position, people coming every day for information. I told them that I could not advise them. I told them everything that had come to me." He also advised the bank employees to be very careful what they said about Ponzi's scheme and not to advise any one. He made inquiries as to the possibility of large profits in foreign exchange or international coupons, and was informed that the government had put a restriction on speculation in that kind of business. He

visited the post office and was shown a reply coupon and testified:

"Well, I did not see how any money could be made to any great extent; it would be a bulky package that would take any amount of those things to make any profit, and it did not look practical to me, and I went back to my customer and so reported. I also made inquiry of some of the banks in Boston.

"Q. Was there a foreign exchange department in your bank at that time? A. There was.

"Q. Were you acquainted with operations in foreign exchange? A. Quite a little."

It is plain that, before the cashier ever met Ponzi, he had information enough to require any competent banker strongly to suspect that Ponzi was a mere fraud worker.

But on June 24, 1920, Ponzi came into the bank, and asked the cashier whether he could borrow some money. The answer was, "No;" that the bank was short of funds, and was then borrowing from the Federal Reserve Bank to take care of its customers. This shows—what is perhaps a matter of common knowledge—that at that time banks were very desirous of increasing deposits in order to use the money at the high and profitable rates then available. Denied the loan, Ponzi drew a check of $100,000 on the Hanover Trust Company, and deposited it with the defendant, saying that he then had about $800,000 there deposited. He drew another check of $250 to the bank, writing across it, "For the help of the bank, with the compliments of Charles Ponzi." This disclosure, in connection with the knowledge which the bank already had as to the feasibility of Ponzi's pretended method of making money, and with Ponzi's reply, when asked by the cashier how he could make 50 per cent. profit in 45 days, viz. "That was his business," showed he was keeping the money in banks, thus negativing the remote possibility of his having discovered some mysterious way of doubling money in a few days. It showed he was unquestionably a swindler, and an insolvent swindler.

The court below finds that "this display of wealth in the presence of the bank officials was a part of Ponzi's advertising scheme," and continues:

"As a further inducement to the people of Manchester and vicinity to invest their money with him, Ponzi, either personally or through his agent, informed the bank that he wished to keep enough money on deposit so that any persons dissatisfied with their investments could come to the defendant bank at any time and receive their money back. I find as a fact that there was an understanding between Ponzi, the defendant bank, and Joseph Bruno that Ponzi should maintain a large deposit in the defendant bank, and enough to satisfy the claims of Manchester investors whose notes matured and any who were dissatisfied with their investment and wanted their money returned."

On this same day, June 24, Additon, the cashier, knew that the president of the Amoskeag Bank had told Ponzi to close out his account as one which that bank did not care to carry. The contrast between the two banks, in their sense of public responsibility, is most significant. I observe, generally, that the great extent of Ponzi's fraud was directly due to the prestige, countenance, and support given him by the banks, that took his deposits, paid checks drawn in disbursing the 50 per cent. profits to the earlier comers, and otherwise sponsored Ponzi as a business man, and not as a fraud worker. If all banks, whose machinery of deposit and checks Ponzi sought in aid of his frauds, had acted as did the Amoskeag Bank, so that Ponzi had been remitted to paying only by cash, his career of this sort of crime would have been narrowly limited and short-lived. The community has a right to require high standards of banks and of their officers, and to expect them to discountenance, and when practicable to expose, fraud, and not directly or indirectly to sponsor it, in order to get deposits for their own profit—in this case the deposits of a mere thief.

Throughout the period in question, the cashier kept his directors fully informed as to the Ponzi situation. Its president was an elderly lawyer, Mr. Hunt, whose advice was generally availed of on legal matters. Mr. Wyman, an attorney of some 20 years' experience, who had previously acted for the bank, and whose office was in the bank building, was in May, June, and July acting as counsel for Bruno and Ponzi, and in August and September as counsel for the bank. Wyman invested on July 2 with Ponzi $15,000, which was paid back to him on August 5 by an arrangement with the bank, stated below. The bank's cashier was in almost daily touch with Bruno. The exact extent to which the bank kept track of the amount of money derived from local victims does not very clearly appear. But from June 24 on the conduct of the parties is consistent with no other inference than that, as the District Court found, the bank was "anxious to secure all the deposits that it could, and its cashier, Mr. Additon, also

had the desire to safeguard the interests of Manchester investors." This desire implied grave suspicion on the part of the bank.

The court below also found:

"On the morning of July 2 the account of the Securities Exchange Company in the defendant bank showed a balance of $191,-870.90. On that day Mr. Additon, the cashier of the bank, Mr. Bruno, with Mr. Wyman, counsel for Mr. Bruno, went to Boston, and Mr. Additon secured from Mr. Ponzi three $50,000 checks ($150,000) for deposit in the defendant bank. I find that this money was secured from Ponzi in keeping with the undertaking above mentioned. It was the desire of the bank and Mr. Bruno, and of Mr. Bruno's counsel, Mr. Wyman, that Ponzi should keep a deposit in Manchester substantially large enough to fulfill the terms of the understanding between them. This was considered good judgment on the part of Ponzi and his agent, Bruno, as an advertisement of their business. The bank was anxious to secure all the deposits that it could, and its cashier, Mr. Additon, also had the desire to safeguard the interests of Manchester investors."

This is a pretty colorless description of a very extraordinary occurrence. The successful solicitation by a bank cashier of the deposit of $150,000 of money, which the bank should have known to be the proceeds of stealings, is a transaction far outside the usual and ordinary course of the banking business.

On July 26, there was general newspaper publicity to the effect that Ponzi's career was under investigation by the criminal authorities in Boston, and that he had agreed to stop taking in money until the investigation was closed; also that there was a run on his Boston office by his note holders. Bruno and Wyman both learned of the situation, and, as the court below found:

"Mr. Wyman, acting as counsel for Mr. Bruno and having in mind the interests of Manchester investors, called up Miss Meli, Mr. Ponzi's secretary, and inquired about the situation."

They were assured that everything was all right and that dissatisfied note holders could have their money back. But an arrangement was made that Bruno should take Wyman to Boston that night. Additon, after trying in vain to get Ponzi by telephone, decided to go with them, acting for the bank. Ponzi then displayed various certificates of deposits, aggregating about $1,500,000, $200,000 or $300,000 in bills, about $200,000 of stock in the Hanover Trust Company and other trust companies, besides Liberty bonds.

While Additon and Wyman both testify that they were convinced by this display of wealth that Ponzi was solvent and able to pay everybody who wanted his money back, and the court below adopts this view, I am unable to accord with that conclusion. I think it underestimates the intelligence of Additon and Wyman, and the significance of what they then did and wrote. Whatever showing was made as to assets, it does not appear that any inquiry was made as to Ponzi's liabilities. Failing disclosures on this point, a more futile and foolish "investigation" can hardly be imagined. What they did shows plainly what they believed. At this interview a written arrangement was made to take care of the Manchester investors. An order was drawn up, finally before signature put in Additon's handwriting, as follows:

"July 26, 1920.

"To the Merchants' Nat. Bank, Manchester, New Hampshire:

"Please pay, and charge to the account of the Securities Exchange Company in the Merchants' National Bank of Manchester, New Hampshire, any and all vouchers issued by the Securities Exchange Company of Boston for the amount designated on the back of such vouchers, and only for those bearing the approval of Joseph Bruno, agent. Securities Exchange Co.,

"By Charles Ponzi, Mgr."

Bruno was shortly after furnished a rubber stamp with which to print on the back of each note a release in consideration of the repayment of the amount invested, without interest. The notes so stamped were to be paid by the bank. It was also arranged that Bruno should advertise in the Manchester newspapers that no more funds would be received until after an official audit had been made to determine Ponzi's solvency and satisfy the district attorney in Boston that his methods of financial operation were legitimate. But the bank, in the face of this audit to determine solvency, insisted on an immediate blanket arrangement to pay off the local victims, not even waiting for checks.

Obviously this arrangement was quite outside the usual course of business as between depositor and bank. It takes on great additional significance, when considered in connection with Wyman's evidence, post, and the finding, supra, of the court below as to the understanding that local investors were to be protected if Ponzi was to have his deposit in this bank.

On the morning of August 2, 1920, Ponzi's insolvency was headlined in the Boston Post. But under this curious arrangement of July 26, to take care of the Manchester investors, large numbers of them brought their notes to Bruno, who stamped thereon the release above referred to and presented them to the bank, which promptly paid them. The notes thus stamped are described as "vouchers," and thus distinguished from ordinary checks. These payments continued during the period from July 28 to August 9, inclusive. The status of the bank account during this period is shown by the court below in the following tabulation and summary:

time, I find that the defendant bank paid on checks drawn in Ponzi's Boston office the sum of $469,091.86. Of this last amount $150,000 was drawn to the order of the Securities Exchange Company and deposited in the Hanover Trust Company, in Boston. I find that on August 2d and thereafter the defendant bank paid Ponzi investors on orders of Bruno the sum of $170,333.25."

But I am unable to accord with the conclusion of the learned District Judge that the bank did not until August 2 know or have reasonable cause to believe that Ponzi's business was not legitimate and that he was insolvent. My views in that regard accord with those of the Supreme Judicial Court

| July 28, 1920. | Deposit | | $ 700.00 |
|---|---|---|---|
| | | | 651,126.97 |
| " " " | Withdrawal checks | $ 4,852.54 | |
| " " " | vouchers | 18,422.00 | 23,274.54 |
| | | | 627,852.43 |
| " 29, " | Withdrawal checks | 209,075.00 | |
| " " " | vouchers | 4,950.00 | 214,025.00 |
| " " " | Amount on deposit at close of business | | 413,827.43 |
| " 30, " | Withdrawal checks | 3,881.52 | |
| " " " | vouchers | 4,000.00 | 7,881.52 |
| " " " | Amount on deposit at close of business | | 405,945.91 |
| " 31, " | Withdrawal checks | 12,060.00 | |
| " " " | vouchers | 200.00 | 12,260.00 |
| " " " | Amount on deposit at close of business | | 393,685.91 |
| Aug. 2, 1920. | Withdrawal checks | 13,010.00 | |
| " " " | vouchers | 40.00 | 13,050.00 |
| " " " | Amount on deposit at close of business | | 380,635.91 |
| " 3, " | Withdrawal checks | 3,357.29 | |
| " " " | vouchers | 1,850.00 | 5,207.29 |
| " " " | Amount on deposit at close of business | | 375,428.62 |
| " 4, " | Withdrawal checks | 101,455.00 | |
| " " " | vouchers | 4,400.00 | 105,855.00 |
| Aug. 4, 1920. | Amount on deposit at close of business | | 269,573.62 |
| " 5, " | Withdrawal checks | 101,027.25 | |
| " " " | vouchers | 94,950.00 | 195,977.25 |
| " " " | Amount on deposit at close of business | | 74,596.37 |
| Aug. 6. 1920. | Withdrawal checks | 2,159.52 | |
| " " " | vouchers | 48,563.25 | 50,722.77 |
| " " " | Amount on deposit at close of business | | 23,883.60 |
| " 7, " | Withdrawal checks | 165.00 | |
| " " " | vouchers | 11,050.00 | 11,215.00 |
| " " " | Amount on deposit at close of business | | 12,668.60 |
| " 9, " | Withdrawal checks | 3,030.00 | |
| " " " | vouchers | 9,490.00 | 12,520.00 |
| " " " | Amount remaining in bank | | 148.60 |

"I find that between July 27 and August 9, inclusive, the defendant bank paid out $197,905.25 on vouchers or orders signed by Mr. Bruno. During the same period of

of Massachusetts as expressed by Rugg, C. J., in Cunningham v. Com. of Banks (June 5, 1924) 144 N. E. 447. In dealing with a comparable situation involving the Hanover

Trust Company, the learned Chief Justice says:

"The officers of the trust company knew Ponzi was a bankrupt at latest on July 12, 1920. The only rational inference which as banking officials or as ordinary business men they could draw from the facts actually known to them was that the bankrupt was a swindler. The facts actually known to them were susceptible of no other construction to the thinking business mind. A man, conducting such operations as the trust company knew at least as early as July 12, 1920, that the bankrupt was engaged in, was entitled to no assistance in carrying on his schemes. The bankrupt must be presumed to have intended the natural and inevitable consequences of his acts. He is chargeable with an intention that his affairs would be settled * * * in the bankruptcy court."

Applying the same general test to the situation clearly disclosed by this record, it seems to me clear that the defendant bank knew, or was chargeable with knowing, on and after June 24, 1920, that Ponzi was nothing but a fraud worker and hopelessly insolvent.

The presumption of ignorance, general and special, in which the mass of uninformed smaller purchasers of Ponzi's notes have been indulged in this district, has no application to bankers and to trained business men. Moreover, the bankers knew what the mass of purchasers did not know—that the proceeds of Ponzi's note sales were not being sent to Europe for investment in some mysterious money-producing scheme, but were being retained as deposits in local banks. The banks were in a position to know what Ponzi was doing with the money he took in, and specifically to know that he was *not* investing it in international coupons or any sort of foreign exchange.

Generally, careers of swindlers of this kind are ended by absconding, or by the appointment of a receiver, who stands in most legal respects in the shoes of the swindler. So far as I have been able to learn, this is the first time that the Bankruptcy Act was ever applied to the liquidation of the affairs of a mere thief. It may be that that kind of business has now become so extensive as to make such application necessary and desirable. Cf. In re Young (C. C. A.) 294 F. 1. Traditionally, bankruptcy was honest—but unfortunate—traders' law. Its extension to careers like Ponzi, with the resultant statutory powers of a trustee to recover unlawful preferences and invalidate conveyances in fraud of creditors, has worked out in results very surprising to the persons who, careless of ethical considerations, were ready to take the chances of profiting at the expense of the later victims of his scheme.

It is plain enough that Ponzi's note buyers fall into two classes:

(1) The foolish dupes—stupid believers that he was really coining money in foreign exchange and international reply coupons.

(2) The undeluded believers that his thieving scheme would last long enough to enable these knowing ones to get 50 per cent. profit out of the losses of the later comers. Bluntly put, these were would-be takers of stolen money, sharers in Ponzi's scheme of fraud. There is no occasion to strain the law in behalf of any intelligent participants in Ponzi's swindle.

I cannot accept the view that bankers, knowing what this defendant knew, were at liberty to assert belief in the legitimacy of Ponzi's scheme, and his resultant solvency, until a newspaper reporter discovered and caused publication of the essential truth. The defendant had a different (and more informing) point of view of Ponzi from that of the dupes who dealt with him.

This conclusion is required merely as an inference from the findings made by the court below and from the documents. But there is much more in the record, constraining to the same view. On practically all controversial matters the plaintiff relied on two adverse witnesses, the defendant's cashier, called by the plaintiff, and Mr. Wyman, called by the defendant. The testimony of both of them was, on material points, substantially different from statements made by them in September, 1920, stenographically reported, and properly used at the trial to refresh their memories, and on many important points to modify or contradict their testimony then given. Moreover, as already indicated, their acts were far more significant than their words. Their evidence and their acts drive the mind to conclusions the reverse of their desires. It is a strong case that grounds itself solidly on the testimony and acts of adverse witnesses, and highly intelligent witnesses.

Wyman had, as Additon knew, acted for Ponzi and Bruno in May, before the insurance commissioner of New Hampshire, on a question arising as to the application of the Blue Sky Law. Wyman, on July 2d, invested $15,000 of his own money in Ponzi's notes, and was thereafter, except for a few days in early August, in almost daily communication with Additon. He regarded, as his evidence conclusively shows, the arrangement with Ponzi to keep deposits suffi-

cient to cover Manchester investors as a real *agreement*. He was active and strenuous in July in attempts to cause Ponzi (his client) to keep this agreement. After Ponzi had, on July 29 and August 4, withdrawn over $300,000 contrary to the agreement, Wyman sought and obtained the promise of new deposits sufficient to take care of the Manchester investors. He arranged with Additon that, if these desired and promised deposits were not forthcoming, his own notes should forthwith be cashed by Additon, without profit, a highly significant circumstance. It told Additon that Wyman had no belief whatever in Ponzi's solvency.

Wyman testified that after he had left his notes with Bruno, to be approved for payment and then deposited with the bank, he told Leveroni, who was acting as counsel for Ponzi in Boston, about the substantial withdrawals (amounting to over $300,000) "that I understood had been made, complained that there was a direct breach of the original understanding I had of the account when I put my money in; that it was contrary to the understanding with creditors in Manchester, and was a serious breach of faith, and that, if those checks were not up there, there would be a serious situation as far as the account was concerned in Manchester"; that he telephoned Additon at the bank on the morning of August 5 that "I had been given to understand that the account would be protected; * * * that if the check did not come through, to cash my vouchers"; that "I knew, when I got away, that I would be helpless to handle the matter if it wasn't cured, and therefore I had those indorsed for cashing, and I undertook to get that account made good. I telephoned to Miss Meli and went to Boston, and then got in touch to have the account made good. My instructions to Mr. Additon were that, if I failed in Boston, to cash those vouchers." On August 4 he wrote and handed to Miss Meli, Ponzi's secretary, a letter as follows:

"August 4, 1920.

"Securities Exchange Company, 27 School Street, Boston, Mass. Attention Mr. Charles Ponzi.—Gentlemen: On my return to Manchester this morning I was stopped by the bank and inquiries were made as to the financial situation with reference to the payment of outstanding Manchester claims. I immediately telephoned Miss Meli in Boston and also Judge Leveroni.

"It was my impression when talking with them that about $200,000 was necessary to make certain that there was enough money here to pay the principal of these claims. Since talking with them, Mr. Bruno has informed me that the original principal now outstanding in Manchester is five hundred thirty thousand dollars ($530,000), and, in order that the deposit in the bank should be sufficient to cover that, the bank tells me that three hundred seventy-five thousand dollars ($375,000) more (not $200,000 as I stated over the telephone) should be sent here at once. Very truly yours."

This letter has great significance on the vital question of the defendant's purpose in getting transfers from the insolvent Ponzi.

It shows that, two days after the Boston Post had published Ponzi's insolvency, the defendant bank was stopping Ponzi's attorney and urging him to get the deposit up to $530,000 in order to provide for the "payment of outstanding Manchester claims."

There is no possible conclusion from this evidence except that Wyman, Ponzi's attorney, but acting in his own interest and in the interest of other Manchester investors, was making the most strenuous attempts, in collaboration with the defendant, to get money from Ponzi *"to get that account made good";* that is, to obtain transfers enough to pay off, at the investment rate, all the Manchester investors, because all the parties then believed that Ponzi was insolvent, and knew his creditors were in a race to get their own claims paid first.

When the bank opened on August 6, the balance in the Ponzi account was $74,596.37. But the morning mail brought a check for $150,000, drawn on the account in the name of the Securities Exchange Company, payable to its own order, and deposited by it in the Hanover Trust Company for payment through the Federal Reserve Bank. This was a check by Ponzi, payable to himself. The defendant refused to honor this check to the extent of Ponzi's deposit. Later in the day another check for $200,000 was presented for payment by a special messenger from the Hanover Trust Company. Payment on this was also refused. The messenger called up Ponzi's secretary, and then asked for a cashier's check for the balance. The defendant also refused this request. During that day, on the vouchers arranged on July 26, the bank paid $48,563.25. On the morning of August 6, another Ponzi check for $75,000 was presented, but the defendant disregarded it and continued to pay on the vouchers until August 9, when the balance was reduced to the sum of $148.60.

The court below declined to find or rule that these transactions, any or all of them, amounted to a cancellation of the arrangement of July 26, and ruled that the bank was, notwithstanding these repeated attempts of Ponzi to withdraw the balance of the deposit, justified in continuing to pay on the vouchers.

The conduct of the defendant bank in continuing to pay Ponzi's local victims after Ponzi had tried, by three checks, to get the money away from the bank, is most significant. It shows at least two things: (1) That the defendant was not treating Ponzi as an ordinary depositor. It is inconceivable that, if it had regarded Ponzi as having only the ordinary relation of bank and business man depositor, it would have continued to pay, on these extraordinary vouchers, after the depositor and putative owner of the money had sought to withdraw the money, presumably for his own use elsewhere. It is unnecessary to resort to fine distinctions as to the technical legal application of checks larger than the bank balance, but when the check for $150,000 presented on August 6, although larger than the balance, was payable to the depositor himself, I cannot see how the bank could legally refuse payment of the balance. Coates v. Preston, 105 Ill. 470. But the checks indicated in the most conclusive fashion Ponzi's purpose to revoke, if he could revoke, the power given on July 26 to pay to the Manchester investors on Bruno's approval. I am constrained to the view that, if the relation between Ponzi and the bank was, as defendant claims, that of depositor and bank, the power to dispose of this deposit accruing under the arrangement of July 26 was ended on August 6, and that all payments made thereafter were without authority from Ponzi, and therefore no legal disposition of Ponzi's insolvent estate. (2) But the bank's attitude had another important aspect, in that it indicated a determination to treat this fund as though it were a trust for local investors in Ponzi's fraudulent scheme, which the bank was conscious had been facilitated by the prestige and respectability given the scheme by Ponzi's deposit of a checking account in this bank. The continued payments to his victims, and the refusal either to hold the money or to pay it over on any of the checks drawn by Ponzi, were emphatic evidence that the bank knew it had obtained from Ponzi deposits as well as transfers from the Boston banks, for the very purpose of applying them in payment of local investors, and was determined to carry out that purpose, even at what it must have recognized was a substantial risk to itself. It emphasized the attitude shown by words and conduct, at least from June 24th, that the bank took, by transfers from Ponzi derived from original investors, and by transfers from other banks, these funds for the purpose of paying them to the local investors, although it knew, or was bound to know, that such payments would operate to hinder, delay, and defraud other creditors of the insolvent.

Further support for the conclusion that the bank sought and obtained transfers of these funds from Ponzi in order to prefer creditors is found in the special interest the bank had in many of the recipients of payments under these vouchers. Among the creditors thus preferred was Wyman, who, as already noted, had formerly been and subsequently was counsel for the bank. His investment was $15,000. The paying teller had $5,000; one clerk, $3,000 or $4,000; other clerks or officials, smaller sums; the cashier's wife's uncle, several hundred dollars; and Bruno and his family apparently received, through payments on these vouchers, about $40,000. As I understand the record, all these payments were made after, on August 2, the Boston Post publication had charged the community generally with knowledge of Ponzi's insolvency.

Summarizing—the record requires these conclusions:

(1) On and after June 24, 1920, the bank was chargeable with knowing that Ponzi was nothing but a fraud worker and hopelessly and increasingly insolvent; yet it lent him the advertising, countenance, support, and prestige of connection with it, in order to get, for its own profit, deposits of money extracted from the victims of his fraud. On that day it also knew that the Amoskeag Bank had so far sensed Ponzi as a fraud as to refuse to keep his deposit account.

(2) From that time on the defendant had an understanding or agreement with Ponzi and his agent, Bruno, that his deposit should be kept large enough in that bank so as to secure local victims in withdrawing at will their contributions. Additon's trip to Boston on July 2, with its resultant increase of $150,000 in the deposit, was in pursuance of this understanding or agreement to get and keep with the defendants a species of security for local victims, while at the same time increasing the defendant's profit through its use of the proceeds of the fraud.

(3) The arrangement of July 26 was procured by the defendant. It was distinct and affirmative action on its part to retain deposits and disburse them in order to prefer

local creditors drawn into Ponzi's scheme partly through the bank's approval of it. Such payments were not in the usual and ordinary course of banking business. Bank v. Massey, 192 U. S. 138, 147, 24 S. Ct. 199, 48 L. Ed. 380.

(4) All payments made on vouchers from July 28 to and including August 1 were made to creditors known to the bank to be preferred; but, so far as this record discloses, the recipients themselves did not then have reasonable cause to believe Ponzi solvent. This covers $27,572.

(5) On and after August 2, when the Boston Post headlined Ponzi as an insolvent, all such payments on vouchers were made to creditors having personally reasonable cause to believe Ponzi insolvent. This covers $170,332.25.

(6) Until the end of August 5, these procured preferential payments were made by the defendant on authority outstanding from Ponzi; but all payments on and after August 6 were made without authority from Ponzi. This covers $69.093.25, which is a part of the above total of $197,905.25.

(7) Ponzi's insolvent estate was depleted by these payments made by the defendant from funds that the bank induced Ponzi to deposit with or transfer from other banks to it, for the purpose of hindering, delaying, and defrauding other creditors not thus preferred.

The fact, emphasized by the court below, and by my brethren in this court, that the defendant paid some checks drawn in the usual course on this account, falls far short of showing that it was an ordinary general account, not obtained or held for the special purpose of payment by way of preference to Manchester victims. For the gist of the case is found, not in the fact that the defendant received and disbursed some deposits on checks, which were, at least in form, in the usual course of the banking business, but in the fact that it procured, by extra banking methods from Ponzi large sums which, to the extent of at least $197,-905.25, it paid out by methods falling entirely outside the usual course of banking procedure, to creditors who, as the bank was chargeable with knowing, were thereby preferred.

It may well be that the bank could be held for some payments made by check to creditors thereby preferred. That question is not before us; for the plaintiff has, while grounding his case upon the intent and purpose with which the bank *procured* these funds, limited his claim to amounts prefer-

entially paid out on these extra-banking method vouchers.

In the majority opinion it is stated:

"If the bank had suspicion, even if Additon realized that Ponzi's business was 'not a legitimate undertaking,' this is far from showing that the bank knew at that time that Ponzi was insolvent. On the other hand, Additon testified affirmatively that he did not know of such insolvency until 'some little time after we had stopped paying on the account,' and that, up to that time, he did not believe him to be insolvent."

To my mind this attempt to induce belief that this experienced bank cashier believed in Ponzi's scheme for a week after his insolvency had on August 2 been headlined in the Boston Post, and two weeks after the newspapers' publication of July 26, discredits the whole defense.

I agree with the majority that "there is a moral duty of banks to the community in which they do business to use reasonable care in seeing that their depositors are not committing a fraud upon the public."

But the effective way for courts to promote the performance of moral duties is by the uncompromising enforcement of legal duties—by holding bankers to the ordinary standards applied to informed and intelligent men. We deal with legal duties; we have no power as a general censor morum. To bankers the excuses of ignorance and mental ineptitude are not available.

It is the business of banks to make money by using other people's money. Sometimes they make as much as 6 to 10 per cent. per year, by lending deposits on which they pay ordinarily 2 per cent. per year. In this case we are asked to find, and my brethren do find, that these bankers believed that Ponzi, of unknown origin and undisclosed capacity, was making for his depositors 400 per cent. per year, besides a profit for his philanthropic self.

I am unable to join in a finding that the defendant's faith in Ponzi was so extensive. It does not appear that the defendant bought any of Ponzi's notes for itself.

I come now to the questions of law arising on the foregoing conclusions of fact. I agree that the plaintiff cannot recover under section 60b, Bankruptcy Act. The defendant was not a creditor, and could therefore not be a preferred creditor. "Preference implies paying or securing a preexisting debt of the person preferred." Dean v. Davis, 242 U. S. 438, 443, 37 S. Ct. 130, 131 (61 L. Ed. 419).

Plaintiff's reliance is and must be on section 67e—that the funds in question were

derived from transfers made by the insolvent to the defendant with intent to hinder, delay, and defraud creditors. The plaintiff grounds his case on the doctrine perhaps most clearly illustrated in Dean v. Davis, supra, where it is pointed out by Mr. Justice Brandeis that "a transaction may be invalid both as a preference and as a fraudulent transfer. It may be invalid only as a preference or only as a fraudulent transfer. * * * But, where the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated." The gist of this case is not found in the preferential payments, but in the active co-operation by the defendant in a swindling scheme after it knew the nature of the enterprise. Specifically, it knew that it was participating in payments by an insolvent swindler, the inevitable effect of which would be to prefer some of his victims over others. The present case falls squarely within the principle of Dean v. Davis, supra. The fraud inheres in the purpose and intent with which the bank got, and Ponzi transferred, the money so used. The use in preferential payments to local creditors simply completed the fraud. Compare Watson v. Adams, 242 F. 441, 445, 155 C. C. A. 217.

In the ordinary case of this general sort of fraud, the transferee becomes a mortgagee of the insolvent and advances his own funds. But, even then, the *essence* of the case is not found in the advance to the insolvent, nor in the payments to preferred creditors, but in the transfer from the insolvent, by way of mortgage, to the transferee with intent to defraud the creditors thus deprived of equality treatment. If, in this case, the bank, instead of obtaining funds by transfers from Ponzi, had taken security on the insolvent's assets, advancing its own funds for the contemplated preferential payments, the invalidity of the security would hardly be questioned. The case would have been on all fours with Dean v. Davis and the other cases cited in the footnote (242 U. S. 445, 37 S. Ct. 132, 61 L. Ed. 419), as follows:

"Cases holding that a mortgage is a fraudulent conveyance, where taken as security for a loan which the lender knows is to be used to prefer favored creditors in fraud of the act: Parker v. Sherman, 212 F. 917 (C. C. A. 2d Circuit); In re Soforenko, 210 F. 562 (D. C. Mass.); Johnson v. Dismukes, 204 F. 382 (C. C. A. 5th Circuit); Lumpkin v. Foley, 204 F. 372 (C. C. A. 5th Circuit); In re Lynden Mercantile

Co., 156 F. 713 (D. C. Wash.); Roberts v. Johnson, 151 F. 567 (C. C. A. 4th Circuit); In re Pease, 129 F. 446 (D. C. Mich.). See also Walters v. Zimmerman, 208 F. 62 (D. C. Ohio); s. c. on appeal, 220 F. 805 (C. C. A. 6th Circuit)."

But, on analysis, it is quite apparent that this transaction is, both in practical results and in the incidence of legal principles, on all fours with the typical case of a mortgage given by an insolvent to secure funds "to prefer favored creditors in fraud of the act." 242 U. S. 445, 37 S. Ct. 132, 61 L. Ed. 419. The position of the defendant is, in all essential legal aspects, identical with the position of the mortgagee who advances money to the insolvent to pay the preferred creditors. In the mortgage case, the trustee in bankruptcy may of course recover, under section 60b (Comp. St. § 9644), from the preferred creditors. And when the mortgagee seeks to prove his claim he must, as a condition of its allowance, surrender his security under section 57g (Comp. St. § 9641). The trustee thus has a double (or alternative) remedy for the fraudulent depletion of the insolvent's estate.

So, in this case, the plaintiff trustee may recover from the creditors preferred by the bank's payments. He may also recover, at least in the alternative, from the defendant. If the defendant pays the amount which it has fraudulently taken from the insolvent's estate, it may probably prove a claim to the aggregate of the amount provable by the creditors preferred by its payments. It apparently thus acquires the rights the creditors legally had to equality treatment in the liquidation of the bankruptcy estate. 2 Rem. §§ 862, 878; In re Bergdoll Motor Co. (D. C.) 230 F. 248, and cases cited. Its position in that regard is like the position of the mortgagee, except that the mortgagee is constrained in his own interest to prove his claim in order to get the dividend justly due the creditor he caused to be preferred. But the fact that in this case the trustee pursues the transferee of property of the insolvent transferred in fraud of the insolvent's creditors, whereas in the typical mortgage case such transferee is in his own interest required to come into the bankruptcy court, makes no difference whatever in the essence of the relation of the transferee to the transaction through which the insolvent estate has been depleted for the benefit of favored creditors.

There is nothing in the suggestion that, in this case, the bank ought not to be penalized because it was (or rather seemed to be) after the completion of the transaction, a

stranger to the bankruptcy proceedings. Its fate in that respect will or may be exactly like the fate of the mortgagee in the common case. It will lose the amount of the preferences it has procured to be made; i. e., the difference between the dividends payable in equality treatment and the amount actually paid the preferred creditors. If the trustee sues both the preferred creditors and the transferee in fraud of creditors, he probably can have but one satisfaction. But both preferred creditors and transferee in fraud of creditors are liable for the depletion of the estate. Both may be held to such restitution (or surrender of security) as may give effect to the equality treatment the act seeks to secure.

This conclusion is, I think, supported by practically all the authorities binding or guiding us. The case is very different from Richardson v. Germania Bank, 263 F. 320, in which the Court of Appeals for the Second Circuit discusses Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419, and the other recent opinions of the Supreme Court, and reaches the conclusion that no new rule of law was laid down by the Supreme Court in Dean v. Davis.

In the Germania Bank Case, it was strenuously urged upon the court that a transfer which operated as a preference, even although the receiving creditor had no reasonable cause to believe it was getting a preference, was fraud within the meaning of section 67e, because the insolvent's estate was depleted by the transfer that the transferor intended to have effect as a preference. That court rejected that contention, and the Supreme Court denied certiorari. 252 U. S. 582, 40 S. Ct. 393, 64 L. Ed. 727.

Parenthetically I observe that the decision of the present case in the court below seems to go on an analogous theory. Judge Morris held that the recipients of the money paid on these vouchers got only what they were entitled to (i. e., they took it as rescinding fraud victims, and not as creditors, and hence not as preferred creditors), adopting the general views which I had expressed in Lowell v. Brown (D. C.) 280 F. 195. The defendant could hardly be held a wrongdoer in helping these recipients to get only their legal rights. But, when the Supreme Court held this underlying proposition wrong, it in effect held the defendant a wrongdoer in procuring the transfer of funds for payment through the defendant to these note holders who were entitled only to the equality treatment provided by the act.

It is far from clear that Judge Morris' views on the crucial question of law now before this court are inconsistent with those which I have been constrained to adopt. He says:

"Nothing short of active fraud or collusion on the part of the bank with the preferred creditor could furnish the foundation for the maintenance of such a claim. Rubenstein v. Lottow, 220 Mass. 156, 164, 107 N. E. 718. In order for plaintiffs to recover on this ground, it must first be shown that the investors who received through Bruno the amount of their original investments stand as preferred creditors, a fact by no means established by the evidence (Lowell v. Brown [D. C.] 280 F. 193), and one which the court cannot assume."

This statement at least indicates that, now that the Supreme Court has determined that Ponzi's victims who, on and after August 2, were repaid, were preferred creditors, the learned District Judge might have reached the conclusion I have stated.

But the prevailing opinion in this court goes far beyond the holding of the court below, and holds, in effect, that it is entirely immaterial whether the defendant was, at any time, chargeable with knowledge of Ponzi's insolvency. Indeed, there is no occasion to discuss that question, or any question relating to preferences, if the defendant did nothing but receive deposits and honor checks, in the usual and ordinary course of the banking business, ignorant of the origin of the deposits and passive as to their destination. I can see neither ignorance nor passivity. I see knowledge of the fraudulent origin of the funds, and activity in procuring their deposit in order to divert them from their proper legal destination. Rubenstein v. Lottow, supra.

The case now before us is radically different from the Germania Bank Case. Here the bankrupt, the transferee (the bank), and the preferred creditors (at least all who were paid on and after August 2) all knew that the transfers were made for the very purpose of getting to these creditors funds that belonged, under the equality treatment required by the act, to all of Ponzi's creditors. If this was not a fraud upon the Bankruptcy Act, and "a transfer, the intent or obviously necessary effect of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act" (242 U. S. 444, 37 S. Ct. 131), one cannot be imagined. And, not leaving the case to rest on paraphrasing, it was a transaction which, from beginning to end, lacked the indefinable,

but essential, element of good faith. One motive leading the defendant to procure this money and disburse it to these local investors was undoubtedly to palliate its own misconduct in sponsoring, to the extent that it did, Ponzi's scheme of fraud. Compare Richardson v. Germania Bank, 263 F., supra, at page 325. It knew that local purchase of Ponzi's notes had been promoted by his connection with the defendant bank.

The pertinent cases in the Supreme Court all, on analysis, accord with the principle briefly stated by Mr. Justice Brandeis in Dean v. Davis, 242 U. S. 438, 444, 37 S. Ct. 131, as follows:

"A transfer, the intent (or obviously necessary effect), of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act, 'hinders, delays, or defrauds creditors' within the meaning of section 67e."

In Van Iderstine v. Nat. Discount Co., 227 U. S. 575, 582, 33 S. Ct. 343, 344 (57 L. Ed. 652), Mr. Justice Lamar said:

"*Conveyances may be fraudulent* because the debtor intends to put the property and its proceeds beyond the reach of his creditors; or because he intends to hinder and delay them as a class; or *by preferring one who is favored above the others. There is no necessary connection between the intent to defraud and that to prefer, but inasmuch as one of the common incidents of a fraudulent conveyance is the purpose on the part of the grantor to apply the proceeds in such manner as to prefer his family or business connections, the existence of such intent to prefer is an important matter to be considered in determining whether there was also one to defraud.* * * *" [Italics mine.] Cases under the present statute, like In re Beerman, 112 F. '663, relied on by the trustee, relate to transactions in which the mortgagee was practically the representative of the preferred creditor and where, consequently, the conveyance was as much subject to attack as though it had been made directly to him. But here the Discount Company was not a creditor of [the bankrupt], and had no relation with the persons to whom the money was paid. National Bank of Newport v. National Bank of Herkimer, 225 U. S. 178. The transfer, therefore, was not a preference to the Discount Company, and could not be set aside without proof that it knew that Fellerman [the bankrupt] not only intended to pay some of his creditors, but to defraud others. The difference between the two classes of cases is authoritatively recognized by Cod-

er v. Arts, 213 U. S. 223, where it was said that 'an attempt to prefer is not to be confounded with an intent to defraud, nor a preferential transfer with a fraudulent one.'"

The Merchants' National Bank made itself "practically the representative of the preferred creditors" and received transfers of funds from the insolvent for the purpose of paying them over (as it did) to creditors thus made preferred, all parties to the transaction knowing (at least on and after August 2) that such preferential payments would operate as a fraud upon Ponzi's other creditors.

The position of the defendant bank in this case is far more obnoxious to sound and adequate administration of the Bankruptcy Act than an assignment for the benefit of creditors, as to which Mr. Justice Brandeis says in a footnote to Dean v. Davis, 242 U. S. 446, 37 S. Ct. 133:

"In accord with this view are also the decisions which hold that a ·general assignment for the benefit of creditors, though without preferences, is void under section 67e because its necessary effect is to hinder, delay, or defraud creditors in their rights and remedies under the· Bankruptcy Act. In re Gutwillig, 90 F. 475; 92 F. 337; Davis v. Bohle, 92 F. 325; Rumsey & Sikemier Co. v. Novelty & Machine Mfg. Co., ·99 F. 699. See Randolph v. Scruggs, 190 U. S. 533, 536; West Co. v. Lea, 174 U. S. 590, 596."

In re Baar, 213 F. 628, 130 C. C. A. 292, cited and relied upon by the defendant, is one of the cases impliedly disapproved by the Supreme Court in this same footnote:

"It is difficult to reconcile the following cases or dicta in them with the great weight of authority and the decisions of this court. In re Baar, 213 F. 628 (C. C. A. 2d Circuit); In re Hersey, 171 F. 1004 (D. C. Iowa); Sargent v. Blake, 160 F. 57 (C. C. A. 8th Circuit); In re Bloch, 142 F. 674 (C. C. A. 2d Circuit); Githens v. Shiffler, 112 F. 505 (D. C. Pa.)."

It is suggested that the conclusion here reached would put an intolerable burden upon banks of determining at their peril whether checks drawn by depositors might not be preferential payments. Not at all. It is but to repeat, to point out that the gist of this case is found, not in the payments made by checks or on vouchers, but in the getting of the funds from the insolvent for the purpose of applying them in fraud of other than the local creditors. No bank honestly and intelligently managed would

have anything to fear from a holding against this defendant. All any bank needs is to do what the Amoskeag Bank did—refuse to take the accounts of obvious fraud workers. And if, at any time, a bank finds itself, without fault, in a dangerous or doubtful position as to responsibility for disbursements being made through its banking machinery, it may easily end its responsibility by closing the account. This bank could have cleared its skirts absolutely by seasonably telling Ponzi to withdraw his account, as the Amoskeag Bank did. Instead of doing that, it solicited, and through co-operation with Wyman kept soliciting, funds for the very purpose of diverting them, as they were in part diverted, in payments to local note holders, who, under the Supreme Court decision, must be held in general preferred creditors, for the Boston Post publication of August 2 was general notice of Ponzi's real condition.

To hold this defendant responsible for the depletion of Ponzi's estate, through its procurement and connivance, would impose no improper or dangerous burden on legitimate banking.

The law does not put upon a bank the unsupportable burden of providing at its peril that its banking machinery shall not be used by depositors, who are or may become insolvent, in making preferential payments.

Conversely, the law does not permit a bank to agree with a known insolvent that he shall have the use of its banking machinery in an obvious scheme of fraud, provided he will put and keep in that bank funds sufficient to pay in full a favored class of the creditors created by and through his scheme of fraud.

The opinion below, and perhaps the majority opinion in this court, seem to go upon the theory that the account was in its entirety either an ordinary general account, or that it was a special trust for the benefit of Manchester victims; that there was no third alternative; that as plaintiff concedes there was no trust—the account must have been an ordinary deposit check account. But there was a third alternative.

Conceding that there was technically no trust, and that the account was treated, *in part,* as a check account, it was also, *in substantial part,* both as to origin and as to destination, not an ordinary check account. In effect, the defendant made it a condition of keeping Ponzi's account in that bank, that the balance should be large enough to take care of local victims. It was immaterial how much went in and out of the account under ordinary banking methods, provided the balance was large enough to take care of local note holders. The understanding or agreement, therefore, was entirely consistent with the account's being in part an ordinary deposit check account. But the essence of the arrangement was for quasi security for the local victims—to secure them in becoming preferred creditors when the inevitable and expected crash came.

Two points of lesser importance remain for consideration:

(1) The plaintiff seeks to recover the entire amount paid out between July 28 and August 9 on these vouchers—$197,905.25. But between July 28 and August 1, inclusive, the bank thus paid $27,572 to creditors who, on this record, are not shown to have had reasonable cause to believe Ponzi insolvent. So far as now appears, plaintiff could not, under section 60b, recover this sum from the recipients. Is the right to recover from the preferred creditors an essential element in a fraudulent transfer depleting an insolvent estate, under the circumstances here disclosed? The question is not free from doubt. I find no case exactly in point. I recognize the plausibility of the argument that fraud participated in by insolvent and transferee is not enough, even if the estate is as a result depleted. Compare Richardson v. Germania Bank (C. C. A.) 263 F. 320.

But in this case the depletion of the insolvent's estate was, and was intended by the defendant and the insolvent to be, by way of preference of favored creditors. It seems to me that the defendant "was practically the representative of the preferred creditors (227 U. S. 582, 33 S. Ct. 343, 57 L. Ed. 652), and that "reasonable cause to believe" on the part of the bank is enough. Newport Bank v. Herkimer Bank, 225 U. S. 178, 184, 32 S. Ct. 633, 56 L. Ed. 1042. I think, therefore, that under these conditions the plaintiff's right of recovery against this defendant is not measured by the plaintiff's right to recover from the creditors receiving preferences as a result of the fraudulent transfers procured by the defendant from the insolvent. It follows that the plaintiff is entitled to recover the full amount paid on these vouchers—$197,905.25.

(2) As noted above, on the defendant's own theory that the relation between Ponzi and the bank was that of ordinary depositor, the defendant's right to pay on these extraordinary vouchers ended with August

5. It follows that, entirely apart from the fraudulent transfers to the defendant, the defendant is liable for the sum of $69,093.-25, disbursed without authority from Ponzi. This is but an additional ground of holding the defendant liable for a part of the said sum of $170,833.25.

In other words, if the arrangement of July 26 was outstanding (and I think that it was not), the bank was, by such payments on vouchers, completing a transaction in fraud of creditors, to the depletion of the insolvent's estate; if it was not outstanding, it was depleting the insolvent's estate by payments without authority from the insolvent.