PEOPLES BANK OF THE VIRGIN ISLANDS

v.

JOSE FIGUEROA, MONSERRATE GARCIA, and WOOK SUH,
FEDERAL DEPOSIT INSURANCE CORPORATION,
As Receiver for PEOPLES BANK OF THE VIRGIN ISLANDS,
Appellant

No. 76-2672

United States Court of Appeals

Third Circuit

Argued April 28, 1977

Filed July 20, 1977

JEAN–ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I., *for appellant*

JOHN B. NICHOLS, ESQ., Christiansted, St. Croix, V.I., *for appellees Wook Suh and Figueroa*

JOHN D. MERWIN, ESQ. (MERWIN, ALEXANDER & O'BRIEN), Frederiksted, St. Croix, V.I., *for appellee Monserrate Garcia*

Before VAN DUSEN, WEIS and GARTH, *Circuit Judges*

## OPINION OF THE COURT

GARTH, *Circuit Judge*

This appeal involves the liability of two accommodation endorsers of a note rendered otherwise valueless by its maker's default and subsequent disappearance from his Virgin Islands home. The district court held that fraud by the holder-bank[1] and unlawful conduct by one of its directors sufficed to discharge the endorsers from their obligation as sureties. We reverse.

### I.

Prior to November 1972, Peoples Bank of the Virgin Islands ("Bank") had loaned $6,000 to Jose Figueroa. Figueroa, apparently in shaky financial condition, encountered difficulty in meeting his payments. He therefore sought a second loan in the amount of $10,000 to consolidate his debts and to provide additional capital for his insurance business. The Bank refused to make the new loan unless Figueroa obtained endorsers, who by their endorsements on the note would become liable in the event Figueroa defaulted. Figueroa procured two acceptable endorsers—Monserrate Garcia and Wook Suh "endorsers", or "appellees"). The Bank, on November 29, 1972, thereupon granted the $10,000 loan, taking Figueroa's note in that sum with the two endorsements. After satisfying by set-off Figueroa's outstanding indebtedness and his overdrafts, the Bank credited the remaining monies to Figue-

---

[1] The Federal Deposit Insurance Corporation, as Receiver for Peoples Bank, was substituted as plaintiff by an order dated December 27, 1975, and has succeeded to the holder-bank's interest in this litigation. Nonetheless, to avoid confusion we will refer throughout this opinion only to "the Bank."

roa's business account. Figueroa made a few payments on the note, the last one of which was received by the Bank on July 10, 1973. He has been in default since then, and has now apparently fled the Virgin Islands.

After Figueroa's default and flight, the Bank turned to the endorsers for repayment. They refused to honor the endorsement agreement, thus sparking the instant litigation in the United States District Court of the Virgin Islands. The district court entered a default judgment against Figueroa, but discharged Garcia and Suh from their endorsement obligation.[2]

The district court rested its decision on two grounds. First, the court held that the Bank had failed to reveal material information about Figueroa's financial condition to the endorsers. Second, the court held that a Bank director who was Figueroa's business partner violated Virgin Islands law in connection with Figueroa's loan. The court thus permitted the endorsers to escape liability. We conclude that neither ground justified the result reached by the district court.

## II.

At the outset, we accept the district court judge's finding that:

the defendants Monserrate Garcia and Wook Suh did not ask for any financial statements of the person, Figueroa, for whom they were going to guarantee the loan nor did they inquire of the Bank regarding the financial situation of Jose Figueroa.

In light of this finding, we cannot credit the endorsers' argument that but for the Bank's nondisclosures and misrepresentations, they would not have fortified Figueroa's loan application with their own credit.

---

[2] The district court's order of November 16, 1975 left open the issue of counsel fees. A subsequent nunc pro tunc order entered by the district court, and a stipulation of the parties respecting the counsel fee provisions of that order, are sufficient to establish our jurisdiction under 28 U.S.C. § 1291.

■ Put simply, the Bank's potential customer for the $10,000 loan, Figueroa, was obviously a credit risk. It was for this reason that the Bank declined a further extension of credit unless satisfactory endorsements to the note were obtained.[2a] While often security for a questionable credit risk is provided by collateral, here the parties agreed that, in the event of default, the Bank would have recourse against solvent individuals—the appellee/endorsers —whose resources would secure the loan. The raison d'etre for an endorsement arrangement such as this one is precisely the fact of which Garcia and Suh now complain they were ignorant, i.e., that the maker's financial condition was such that the Bank considered him, standing alone, to be a poor credit risk. For the endorsers to contend that the Bank did not affirmatively offer financial information about Figueroa, or his account, and that they should therefore be released from their obligations as sureties, would be no different than a purchaser of goods at a fire sale demanding a refund because his goods are smoked-damaged. An endorsement agreement removes bank resistance to an extension of its credit by transferring any loss upon default to the endorsers. Almost by definition, where financially responsible endorsers are required as a condition for the granting of a loan to the maker, the risk that the maker will default is not insubstantial.

■ Here, the Bank played no role in procuring the two endorsers.[3] The facts found by the district court are clear that the endorsers were not induced by the Bank to guarantee Figueroa's note. Moreover, at no time did they

---

[2a] Mr. Artee Walker, F.D.I.C. collection agent, testified that a loan of this size ($10,000) not secured with physical collateral would not have been granted by the Bank without endorsers. (Notes of Testimony at 67–68) (hereinafter NT —). Mr. Garcia substantiated this requirement when he testified that Figueroa told him that in order for Figueroa to obtain the loan he desired, the Bank insisted upon endorsers, (NT 133).

[3] The district court's finding of fact No. 10 reveals that it was Figueroa who obtained the commitments to guarantee his note from both Suh and Garcia.

ever question or seek information from the Bank regarding Figueroa's financial condition.[4] We have been shown no authority by the appellees, and we know of none, which establishes a duty upon the Bank to offer or disclose information concerning a customer's account. Indeed, the Bank could hardly have volunteered financial information (or even acceded to an unauthorized request from prospective endorsers to disclose such data) without breaching duties of confidentiality and privacy in its dealings with its customers. See Peterson v. Idaho First National Bank, 83 Idaho 578, 367 P.2d 284 (1961); Annot., 92 A.L.R.2d 891 (1963); 10 Am. Jur. 2d, Banks § 332 (1963); see also First National Bank v. Brown, 181 N.W.2d 178, 183 (Iowa 1970) (recognizing the duty of confidentiality but holding for the endorser where the withheld information was of public record).[5] While we need not and do not reach the question of the conflicting duties that may be owed by a bank to its customers and to third-party endorsers when the endorsers *ask* the bank to reveal privileged financial data about its customer, we have no difficulty in determining where the bank's principal loyalties must lie in the absence of such a request.

Even a cursory reading of the trial testimony reveals that Garcia and Suh agreed almost off-handedly to endorse Figueroa's note without giving any thought whatsoever to Figueroa's existing obligations to the Bank, or for that matter without giving any thought to their own future contingent liabilities. At trial they testified time and again that they were busy with other matters when Figueroa approached them; that they had previously endorsed

---

[4] Not only did the endorsers fail to seek relevant financial information from the Bank (regardless of whether it would have been furnished), but even more surprisingly, they failed to obtain financial information and statements from Figueroa, who, if asked, would undoubtedly have been hard-pressed not to supply such information or statements in view of his need for their endorsements.

[5] The Brown decision is discussed further at note 6 infra.

commercial paper without problem; and that they sought no information from any one, particularly the Bank, respecting any aspect of the Figueroa transaction.

Dr. Suh testified that he had signed the $10,000 note in his office, but did not realize that he was signing for that amount (NT 86). He affirmed that "Figueroa came to my office and said that he needed to borrow some money for his business, and asked me to sign a paper, which I did." (NT 92). "We were together for about 30 seconds or one minute; I signed and he left the office." (NT 93). Dr. Suh stated that he knew he was signing (endorsing) a note (NT 93–94, 96), and that he had a "full load of patients at that time, and had to leave the patients for a few minutes for this purpose." (NT 93). Dr. Suh also testified that he did not know at the time that he was signing for $10,000; it could have changed his mind if he had known that that was the amount involved (NT 98). Nor did Dr. Suh know anything about Figueroa's financial problems, although he "knew that Figueroa was an insurance agent in partnership with a director at the Bank and that he owned a house and appeared to be solvent and capable of payment of his outstanding indebtedness, if any." (NT 99).

Dr. Suh also testified that he never knew Mr. Garcia "before until this thing [i.e., the litigation] came up," and, significantly, that Garcia and he did not sign the note together (NT 104). He testified unequivocally in response to his attorney's question on direct examination:

Q. I show you now, sir, Plaintiff's Exhibit No. 5 [Figueroa's loan application from which revealed the $5,000 debt to the Bank plus a $742.67 overdraft] and ask you whether at the time you endorsed the note for Mr. Figueroa you had ever seen that paper?

A. No sir. (NT 87).

Again, Dr. Suh testified:

Q. Now, doctor, had you ever seen those papers, Plaintiff's Ex-

59

hibit No. 5 or Plaintiff's Exhibit No. 6 [Figueroa's financial statement] prior to the time you endorsed the note for Mr. Figueroa? A. No. (NT 88).

Dr. Suh admitted that the first time he knew anything about Figueroa's prior bank loans was after Figueroa's default on the note at issue here (NT 107).

Garcia testified that Figueroa told him that he (Figueroa) needed money for business purposes (NT 116); that he had previously endorsed a note for Figueroa (NT 121) and had loaned him money (NT 122); that when asked if he had paid the note which Garcia had previously signed for him, Figueroa answered, "Yes" (NT 123). Garcia also claimed to have signed the $10,000 note at issue "down in my office" (NT 124). ". . . [H]e [Figueroa] came in to ask me for a loan, I mean to sign the signature, and the only thing, the only question I asked him was what he was going to do with the money, you know, and he told he was going to use it to buy furniture for the expansion of this office, and he was going to take an office there in People's Bank." (NT 124–25). Garcia also testified that he knew the amount of the note was $10,000 (NT 126); that Figueroa told him that the Bank required endorsers in order for Figueroa to get the loan (NT 133); that the Bank never solicited his endorsement (NT 130); and that he did not call the Bank to inquire about Figueroa's financial dealings (NT 125).

With this testimony as a backdrop, it is apparent that neither Garcia nor Suh relied upon even the information available and revealed in Figueroa's loan application. Despite the recitations in the "Statement of Endorser" which both had signed—that each has "read the application of [Figueroa] for a loan of $10,000—," their testimony is clear that neither had read that document prior to signing as endorsers. Although the district court apparently found that the note was endorsed by Garcia and Dr. Suh on

60

November 29, 1972, (Finding No. 11), there is no finding (1) that all signatories, including the endorsers, signed at the bank or (2) that the note was signed in the presence of the endorsers, and that each endorser signed in the presence of the others. Quite to the contrary, the testimony of Dr. Suh and Garcia is that the note, whenever signed, was signed in their respective offices. As Dr. Suh testified:

Q. What is your relationship to Mr. Garcia?
A. I never knew him before until this thing came up.
Q. So that you did not sign this note together, did you?
A. No. (NT 104).

The finding of fact made by the district court is not to the contrary if we assume, as we must, that the district court too was aware that the places of signing by the endorsers were at their respective offices and not at the Bank.

█ The testimony of both Garcia and Suh reveals that at the time of their respective endorsements neither was concerned with, nor relied upon the extent of Figueroa's obligations to the Bank *as represented by the Bank*. The only testimony which even bears on this subject is the testimony of Garcia, who apparently inquired of Figueroa (not the Bank) about Figueroa's obligations to the Bank and also whether a prior note which Garcia had signed for Figueroa had been paid. Figueroa answered "He [Figueroa] was clear." NT 123. To the extent that this statement constituted a misrepresentation upon which Garcia relied, it was a misrepresentation made by Figueroa and not by the Bank.

We recognize that both endorsers acknowledged by their signatures on the "Statement of Endorsers" that they had read Figueroa's loan application which revealed his indebtedness to the Bank, yet those acknowledgments cannot be deemed to override the unequivocal testimony of both endorsers that they had endorsed the notes without

61

knowledge of Figueroa's financial dealings with the Bank.

In view of the endorser's total lack of knowledge of, and reliance upon, even the information which appeared on Figueroa's loan application, it is not possible to give credit to any claim that the Bank misrepresented to them either the fact or the amount of Figueroa's liabilities at the time of endorsement. The simple fact is that, for one reason or another, neither endorser made any inquiry regarding Figueroa's indebtedness, and, being pressed by other unrelated business affairs, both trustingly endorsed the note which has unfortunately resulted in imposing liability upon them. The entire record belies any claim of the endorsers that it was the Bank's conduct rather than Figueroa's which caused their damage.

Of course, had inquiry been made of the Bank, a circumstance not present here, we can surmise that permission to divulge Figueroa's financial condition would have been first sought by the Bank and, in all likelihood, granted by Figueroa. Whether or not that information would have discouraged the two endorsers from pledging their credit on Figueroa's behalf is not for us to determine.

It is enough for us to recognize that here the Bank neither procured the endorsers nor induced them to endorse, nor was the Bank asked for any financial details pertaining to Figueroa's account. Had any of those circumstances obtained here, we would be presented with a different case. Absent such circumstances, endorsers who make no inquiries of the maker's bank and who are procured solely by the maker of the note cannot expect the bank which holds the note to protect their interests. E.g., Cunningham v. Merchants' National Bank, 4 F.2d 25, 30 (1st Cir.), cert. denied 268 U.S. 691 (1925).

Here, the Bank was fully justified in assuming that

Garcia and Suh, both of whom were obtained as endorsers by Figueroa, were extending their credit because of their reliance on and knowledge of Figueroa—not on any representation, silent or express, made by the Bank. The circumstances under which Garcia and Suh became endorsees cannot be deemed to drain the endorsement warranties of their effect.[6]

### III.

█ The district court also denied effect to the endorsement agreement because of an alleged violation of a Virgin Islands statute by a director of the Bank. The court found that the director, one Walter Adam, had recommended Figueroa to the Bank for a loan and had thereafter constructively received proceeds from the loan via his business partnership with Figueroa. As appears by Figueroa's loan application, Adam was Figueroa's business partner in an insurance agency; and apparently Mrs. Figueroa was an employee of that concern. Adam was also the landlord of the apartment where Figueroa lived. Dr. Suh knew that Adam was a director and that Figueroa and Adam were partners. Garcia knew only that Adam was a responsible businessman. The argument proceeds that

---

[6] Appellee Suh relies on First Nat'l Bank v. Brown, 181 N.W.2d 178 (Iowa 1970), to sustain the district court's holding that the endorsers may avoid their endorsement warranties. We find that reliance misplaced. While we agree that the facts in Brown appear similar to the instant factual context, that similarity is purely superficial. In Brown, unlike our situation, the bank not only misled the endorser, but "designedly failed to reveal [the] facts [of its security interest] to the borrowers prior to consummation . . . of the loan transaction," and "secretly intended to ameliorate its unfavorable financial position." 181 N.W.2d at 182. Further, the information involved was of public record and hence not embraced within any duty of confidentiality. Id. at 181. The endorser in Brown conferred with the bank president who, although he knew of the financial difficulties being encountered by the business which was the subject of the sale to the borrowers, nevertheless encouraged the purchase and the loan, suggesting by name the endorsement of an individual known to have substantial means. At no time were the bank's liens (which the bank intended to discharge from the proceeds of the loan) revealed to the borrowers. It was these facts that led the Brown court to characterize the bank's conduct as "deceptive," "luring the defendant into the transaction in order to ease the bank's difficulties." Id. at 182.

Here, as the district court's findings reveal, and as we have discussed in text, the conduct of Peoples Bank cannot be so characterized.

because Adam had apparently recommended that Figueroa see a Bank officer about a loan, and because the procurement of a loan by an officer or director of a bank for his own use is illegal under Virgin Islands law,[7] the endorsement agreement was voided. We cannot agree.

First, the record is clear that Adam's "recommendation" of Figueroa was not in any sense a basis for the loan's approval. Apparently, Adam did no more than refer Figueroa to a lending officer. The handwritten lending officer's comments on the Bank's "Commercial Loan Interview Form" indicate that far from authorizing or even influencing the Bank's granting of the loan, Adam's name merely appears as someone who had recommended Figueroa for normal processing. The Bank's form reveals the name "Walter Adam, Director," inscribed next to the printed caption, "Recommended by." The writing on the form continues: "We are awaiting word from Figueroa re endorser."

It is evident that Figueroa's loan was authorized only because *he* obtained responsible endorsers. Nothing appears to suggest that Adam's "recommendation" would have satisfied the Bank absent the guarantee of the endorsers. Even Garcia acknowledged that Figueroa had told him ". . . that the People's Bank required endorsers in order for him to get the loan." (NT 133). From the Bank's perspective, then, Adam was not involved.

From any other perspective, the fact that Adam was a Bank director is similarly irrelevant. The district court did not find that Adam had recommended that a loan be given

---

[7] The applicable provision reads:

> No director or officer of a bank or foreign bank shall obtain a loan in such bank or foreign bank. Any person wilfully violating the provisions of this subsection shall be fined in an amount equal at least to twice such amount as shall have been obtained by him, or imprisoned not more than one year, or both. The officer, agent or employee of the bank or foreign bank granting such loan shall be fined in an amount equal to twice such amount as may have been loaned, or imprisoned not more than one year, or both. 9 V.I.C. § 113(d).

to Figueroa, but that he had only recommended Figueroa to the Bank manager. Even accepting this finding, we cannot conclude that the mere recommendation of a prospective borrower by a director or officer of a bank is sufficient under Virgin Islands law to permit an endorser to avoid his guarantee of payment on the maker's default. Even if Adam had violated criminal provisions of the Virgin Islands Code (and we do not pass on this issue), no connection appears between such a violation and the loss which the Bank would be obliged to bear if the endorsers' warranty was declared invalid.

We do not decide whether or not any civil cause of action might lie against Adam by virtue of his position as a member of the board of directors, or against the Bank officer who authorized the loan, as that issue has not been raised and is not before us. It is significant to us, however, that the particular criminal provision which proscribes the obtaining and granting of such a loan is designed to benefit rather than penalize the Bank[8]—whereas the remedy proposed by the district court (of invalidating the endorsers' obligations) would achieve precisely the opposite result. Further, it is difficult for us to understand the district court's conclusion (NT 140) that because Dr. Suh ". . . knew that Adam was a director . . . [and] . . . Mr. Garcia relied on the fact that Adam was a responsible businessman . . . and was a partner in Figueroa [sic], . . . that [therefore] Walter Adam violated the laws of the Virgin Islands regarding banks, specifically Title 9 Virgin Islands Code Section 113, Subsection d. . . ." (see n.7 supra). Even if the knowledge of Dr. Suh and the reliance of Mr. Garcia can be said to have imposed some form of civil liability upon Adam (and none has been charged) it just does not follow that such knowledge and reliance can

---

[8] See generally 10 Am. Jur. 2d Banks, §§ 239–41 (1963); Annot., Loans to Bank's Officers or Directors, 49 A.L.R.3d 737, 734 (1973).

constitute a violation of 9 V.I.C. § 113(d)—which among other things requires wilfullness in obtaining or granting a loan by a director or officer of a bank. Adam's mere recommendation of Figueroa to the Bank, as found by the district court, falls far short of satisfying the provision of 9 V.I.C. § 113(d) that "No director . . . shall [willfully] obtain a loan."

Moreover, even if Adam had violated Virgin Islands law and even if that fact were relevant in the context of this case, such a criminal violation is hardly supported by the record. As noted, there is no evidence of wilfullness,[9] nor could there be since Adam's wilfullness was never in issue. Furthermore, it was not Adam who applied for the loan, or who secured approval of the loan from the Bank. Nor did the Bank give the loan proceeds to Adam. The loan was made to Figueroa, and the proceeds of the loan were distributed pursuant to Figueroa's directions.[10] In short, whatever Adam's relationship was to the Bank and whatever civil liability may have or could have resulted in favor of the endorsers vis-a-vis Adam, it can provide no basis for discharging the endorsers' obligations under their guarantees.

On this record we can ascertain no basis by which the endorsers can avoid their liability under their endorsements and guarantees.[11]

---

[9] 9 V.I.C. § 113(d); see generally Annot., note 8 supra, at 736.

[10] Although the testimony would indicate that some small portion of the loan ended up in a business account in which Adam had an interest, the record is barren of any indication that the monies from the business account benefited anyone other than Figueroa.

[11] Although the Bank has urged that it should prevail because it is a holder in due course as defined under the Uniform Commercial Code, 11A V.I.C. § 3–305, we do not rely on that status in holding Garcia and Suh to their endorsements. While we note that a payee may indeed be a holder in due course under the Code, id., § 3–302(2), one who has dealt directly with a party to the instrument is granted only the rights accorded a simple holder, id. § 3–305(2); see J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 14-7, at 478-79 (1972). Those rights are derived from basic contract law rather than from any provisions of the Code. 11A V.I.C. § 3–306; J. White & R. Summers, supra, § 14-11, at 490-91.

The documents signed by Garcia and Suh were signed not only as

## IV.

Because we have concluded that the district court erred in refusing to give effect to the parties' endorsement agreement, the judgment of the court cannot be sustained. The district court's Judgment of November 16, 1976 will be reversed, and the case will be remanded with directions that judgment be entered in favor of the Federal Deposit Insurance Corporation, which, as noted (see note 1 supra) has succeeded to the interest of the plaintiff Bank. Each party will bear its own costs.

---

endorsements but a "Statement of Endorser" form signed by each provided, "I understand that I shall be responsible for payment should Jose Figueroa default in payment." Further, the endorsement legend signed by both provided: "The undersigned, jointly and severally, intending to be legally bound, guarantee the prompt payment of principal and interest. . . ."